*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BILL S. and CLARA B., | ) | |
| | ) | Supreme Court Nos. S-16998/17002 |
| Appellants, | ) | |
| | ) | Superior Court Nos. 3ST-15-00001/ |
| v. | ) | 00002 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | O P I N I O N |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | No. 7335 – February 15, 2019 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Alexander T. Foote, Assistant Public Advocate, and Chad Holt, Public Advocate, Anchorage, for Appellant Bill S. Megan R. Webb, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Clara B. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Jahna Lindemuth, Attorney General, Juneau, for Appellee. Lisa Wilson, Assistant Public Advocate, Anchorage, Guardian Ad Litem.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

STOWERS, Justice.

## I.  INTRODUCTION

The superior court terminated a mother's and a father's parental rights to their two Indian children.  The parents appeal, arguing the superior court erred in finding, by clear and convincing evidence, that OCS made active efforts to prevent the breakup of the Indian family.  Because there is insufficient evidence to support an active efforts finding under a clear and convincing evidence standard, we reverse the superior court's active efforts finding, vacate the termination order, and remand for further proceedings.

## II.  FACTS AND PROCEEDINGS

### A.  The Family And OCS Involvement

Bill and Clara are the parents of Noah and Olwen,[1] ages 12 and 5 at the time of the termination trial.  Noah and Olwen are Indian children within the meaning of the Indian Child Welfare Act (ICWA) based on their affiliation with the Aleut Community of St. Paul Island (the Tribe).[2]  Bill and Clara have a lengthy history of alcohol abuse and domestic violence.  Noah and Olwen have suffered primarily through neglect and mental injury from exposure to their parents' conduct.  While Bill's and Clara's violence is typically directed at each other or other family members, there are some reports of alleged physical abuse of Noah.

The family lived on St. Paul Island, a small, remote community in the Bering Sea.[3]  Noah and Olwen were removed from their home in August 2015, and the

---

[1]     We use pseudonyms to protect the family's privacy.

[2]     *See* 25 U.S.C. § 1903(4) (2012) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.").

[3]     *See* DEP'T OF COM., COMMUNITY, AND ECON. DEV., DIVISION OF

(continued...)

Office of Children's Services (OCS) filed an emergency petition to adjudicate them as children in need of aid based on repeated violence and alcohol abuse in the home. The Tribe supported OCS's intervention. The children were first placed with a relative on the island, in accordance with ICWA placement preferences,[4] but they were later moved to another relative's home in Wasilla after the on-island placement was unsuccessful. Noah and Olwen were adjudicated as children in need of aid in February 2016 due to exposure to domestic violence and substance abuse in the home.[5]

Prior to the Child in Need of Aid (CINA) adjudication hearing, OCS communicated with Clara regarding the changes she needed to make to address her substance abuse and domestic violence issues. But OCS did not finalize a case plan for the family until two days before the hearing — more than five months after the children were removed from the home. Clara participated in a substance abuse assessment in October 2015, but she did not actively engage in follow-up treatment. Bill was

---

**3** (...continued)
COMMUNITY AND REGIONAL AFF., *Community: Saint Paul*, https://www.commerce.alaska.gov/dcra/DCRAExternal/community/Details/1f2a29c3 -65c7-4e5f-a83b-807f17a3ab25 (last visited Oct. 17, 2018).

**4** 25 U.S.C. § 1915(b) (ICWA placement preferences include: "(i) a member of the Indian child's extended family; (ii) a foster home licensed, approved, or specified by the Indian child's tribe; (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.").

**5** *See* AS 47.10.011(8)(B)(iii) (children at substantial risk of "mental injury" due to repeated exposure to domestic violence); AS 47.10.011(10) (children at "substantial risk of harm" due to parent's substance abuse).

incarcerated intermittently during this time, and it is unclear if he ever completed a substance abuse assessment.[6]

During the adjudication hearing the superior court issued warnings to both Clara and OCS regarding the inadequacy of their actions to date. The court warned Clara that she needed to "get alcohol treatment so that [she could] avoid exposing [her] children to tremendous danger," and that if she did not "get into treatment soon and begin it and do well, . . . then it's entirely likely that [her] parental rights [would] be terminated." The court told OCS that it did not "see a whole lot of active efforts" and it was "not all that impressed with the quality of the efforts." While the court found "by the slimmest of margins that [OCS] . . . made active efforts," it made "clear that this is as little over the line of active efforts as you can get while crossing the line."

Despite these warnings, none of the parties appear to have remedied their efforts. For its part, OCS facilitated regular family contact via phone calls and provided transportation and lodging for in-person visits. OCS also provided mental health services to Noah and Olwen[7] while they were placed in Wasilla, but in January 2017 the children were placed with a different relative in Juneau and did not receive services for almost a year due to waitlist issues. OCS contracted with the Tribe to provide on-island

---

[6] OCS's petition for termination of parental rights states that Bill participated in a substance abuse assessment, but there is not an assessment in the record and the OCS caseworker testified that she did not "specifically recall him obtaining an alcohol assessment." Bill testified that he did "an assessment" through the Tribe but did not recall being offered a substance abuse evaluation during his incarceration.

[7] Olwen was diagnosed with post-traumatic stress disorder and experienced frequent behavioral issues. Noah was described as a "parentified" child who felt responsible for caring for Olwen. He also bullied his foster brother, which threatened the stability of the children's later placement in Juneau.

services to Bill and Clara, but there is no documentation in the record of how active or consistent those services were.

Bill and Clara, for their part, both attended "brain trauma" and "healthy relationships" classes in March 2016.  Clara applied to one inpatient treatment facility, but the facility deemed her to be inadequately motivated and declined to accept her into the program.  But throughout the time period of their children's removal, Bill and Clara continued to engage in significant domestic violence and alcohol abuse.  Accordingly, OCS petitioned to terminate their parental rights in August 2017.

**B.    The Termination Trial And The Superior Court's Decision**

The termination trial was held in October 2017.  To demonstrate its efforts at family reunification, OCS presented testimony from the OCS supervisor for St. Paul Island, who also worked intermittently as the primary caseworker for the family.  Philip Kaufman testified as an ICWA expert witness in support of OCS's position that "continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[8]  The court also heard testimony from the chief of police for St. Paul Island, one of the children's foster parents, and from Bill and Clara.  OCS admitted into evidence the family case plan and contact plan, criminal and medical records for Bill and Clara, and medical and mental health records for Olwen.

After hearing witness testimony, the superior court found "that neither parent had remedied the conduct that placed each child at substantial risk of harm[,] . . . that termination of parental rights was in the best interest of each child[,] . . . [and] that continued custody of either child by either parent was likely to result in serious emotional damage to the child."  The superior court deferred making a finding on OCS's

---

[8]    25 U.S.C. § 1912(f).

active efforts to "prevent the breakup of the Indian family," instead opting to further review the evidence and the parties' arguments before reaching a decision.

In January 2018 the superior court issued a written order concluding that active efforts had been made and granting the petitions to terminate the parental rights of both parents. The court made a number of findings related to active efforts by OCS and the Tribe:

> From the initial removal both parents exhibited serious problems with alcohol, marked by regular episodes of mutual domestic violence, nearly always when intoxicated. [Clara] and [Bill] would occasionally superficially acknowledge their problems, but would soon return to longer periods of denial and relapse.

> Both parents lived in St. Paul for most of the period of removal, although [Bill] was incarcerated off island intermittently. At the insistence of [OCS], and with the help of tribal representatives, both [parents] obtained alcohol assessments on St. Paul. But there are only limited treatment resources on the island. There is only an outpatient program available. Each parent would attend sessions [of the outpatient program] intermittently. Neither parent completed the program and the sessions that each did attend had little impact on either parent.

> Although no assessment called for in patient treatment, the OCS social worker tried to convince [Clara] that outpatient treatment was not sufficient. [Clara] would occasionally express a willingness to enter residential treatment. She did apply to one residential program (Old Minto); however, she told the provider that she was only willing to enter the program to satisfy OCS. The program found her to be inadequately motivated. At other times she conditioned her enrollment in residential treatment on [Bill] or the children attending with her. [OCS] reasonably was unwilling to pull the children from their foster homes or disrupt their ongoing schooling.

While [Bill] was incarcerated he was given opportunities to obtain treatment for alcohol abuse. He would either decline or put forth so little effort that the treatment had little impact. Both OCS and tribal authorities visited [Bill] while he was incarcerated in hopes of convincing him to engage in needed and available treatment while in jail. Those efforts were fruitless. They offered to have [Bill] assessed while in jail. He declined.

OCS and tribal authorities encouraged both parents and especially [Clara] to attend counseling regarding the impact of domestic violence on children. There were limited classes available on St. Paul. However, both parents continued to deny that domestic violence was a problem in their relationship or that either child might be at risk of physical or emotional harm from being the target of such violence or witnessing it.

Neither parent was willing to move from St. Paul despite OCS and tribal authorities recommending that each do so in order to gain access to greater rehabilitative resources elsewhere. The children were placed with relatives in Wasilla and Juneau after OCS removed them from the parental homes. OCS flew each parent to visit the children. For periods [Clara] was visiting monthly. At one point while the children were in Wasilla, the parents were so intoxicated at a hotel that in-person visits were suspended.

Both OCS and the tribe had worked with both parents to get them to stop or reduce their drinking "for years" even before the removal in 2015. Although [the caseworker] could not identify exact dates, she recalled OCS and tribal involvement with the parents for alcohol abuse and domestic violence since [Noah] was a toddler and during the pregnancy with [Olwen] in 2012.

The superior court also expressed serious doubt about OCS's case and noted it "left the [termination] hearing concerned that it would not be able to find that [OCS] had proven active efforts." The court was "underwhelmed by the quality of

testimony . . . offered about the efforts that OCS and the tribe had made to help the parents." The court explained there was "very little detail about when those efforts were made" and there were "only vague descriptions of what the tribal authorities had done." Recognizing the difficulty of remotely supervising OCS efforts in St. Paul and the "limited services" available on the island, the court noted it is therefore "particularly important that the witness [for OCS] has researched the OCS records and thus [is] prepared to describe the services that were offered." The court stated its initial impression "was that [OCS] made a rather lackadaisical effort" and "put on a skeletal case about [its] required active efforts."

Ultimately, however, the superior court concluded OCS met its active efforts burden, due in large part to "the consideration the Court is to give to the parents' demonstration of an unwillingness to change or participate in rehabilitative efforts." The court explained both parents exhibited a "consistent and extremely damaging" pattern of behavior for years:

> They abuse alcohol several times a month and engage in very serious domestic violence against each other and family members. They deny that there is a problem. They decline alcohol treatment. They refuse to engage in any classes or counseling about domestic violence. They have done little, if anything, to change their conduct, even though [OCS] has removed their children from their homes for over two years.

The court concluded that "[u]nder these tragic circumstances" OCS met its burden to show by clear and convincing evidence "active efforts to provide remedial services and rehabilitative programs to help each parent address his or her behavior."

The court terminated Bill's and Clara's parental rights to both children. Both parents appeal the court's active efforts finding.

## III. STANDARD OF REVIEW

"Whether OCS made active efforts as required by ICWA is a mixed question of law and fact."[9] We review the superior court's findings of fact for clear error, but "we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA."[10]

## IV. DISCUSSION

### A. Active Efforts Under ICWA

Pursuant to ICWA, "[b]efore terminating parental rights to an Indian child, a court must find that 'active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.' "[11] We conduct active efforts inquiries "on a case-by-case basis because 'no pat formula' exists for distinguishing between active and passive efforts."[12] Generally, "active efforts will be found when OCS 'takes the client through the steps of the plan rather than requiring that the plan be performed on its own,'

---

[9] *Caitlyn E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 399 P.3d 646, 654 (Alaska 2017) (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011)).

[10] *Id.* (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 526 (Alaska 2013)).

[11] *Id.* (quoting *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 760-61 (Alaska 2009)); *see also* 25 U.S.C. § 1912(d); 25 C.F.R. § 23.120(a) (2018); CINA Rule 18(c)(2)(B).

[12] *Philip J.*, 314 P.3d at 527 (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

but not when 'the client must develop his or her own resources towards bringing [the plan] to fruition.' "[13]

In 2016 the Bureau of Indian Affairs (BIA) implemented new regulations (the Regulations) related to the active efforts requirement, setting a "nationwide definition for this critical statutory term."[14] The Regulations took effect December 12, 2016; as such, they were in force at the time OCS filed its August 2017 petition to terminate Bill's and Clara's parental rights.[15] The Regulations define active efforts as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[16] The Regulations reaffirm that what constitutes active efforts is fact-dependent and that "efforts are to be tailored to the . . . circumstances of the case."[17] Finally, and of critical importance to this appeal, the Regulations state that "[a]ctive efforts must be documented in detail in the record."[18]

---

[13] *Id.* (alteration in original) (first quoting *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 602-03 (Alaska 2001); and then quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010)).

[14] Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,790 (June 14, 2016) (codified at 25 C.F.R. pt. 23).

[15] *Id.* at 38,778; 25 C.F.R. § 23.143 ("None of the provisions of this subpart affects a proceeding under State law for . . . termination of parental rights . . . that was initiated prior to December 12, 2016 . . . .").

[16] 25 C.F.R. § 23.2.

[17] *Id.* (including a list of 11 examples of what active efforts may include).

[18] 25 C.F.R. § 23.120(b).

Bill and Clara argue OCS's evidence was too "vague" and "over generalized" to demonstrate active efforts by clear and convincing evidence.[19] We agree.

## B. It Was Error To Find By Clear And Convincing Evidence That OCS Made Active Efforts.

The superior court found by "clear and convincing evidence that . . . [OCS] made active efforts to provide remedial services and rehabilitative programs," based in large part on Bill's and Clara's "demonstration of an unwillingness to change." Bill and Clara argue OCS's evidence was vague and overgeneralized and therefore not sufficient to demonstrate active efforts. "Whether substantial evidence supports the court's findings that the state complied with ICWA's 'active efforts' requirement . . .[is a] mixed question[] of law and fact."[20] Bill's and Clara's argument is not based on "specific factual errors [made by the superior court,] but on whether [OCS's] efforts satisfy the

---

[19] Bill and Clara also argue the superior court inappropriately discounted the lapse in mental health services to Noah and Olwen during their placement in Juneau as irrelevant to the issue of active efforts. We have previously upheld OCS's discretion to prioritize which services should be provided to a family based on the specific needs of the case. *See Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 351 n.22 (Alaska 2016). OCS reasonably focused its efforts (such as they were) on addressing the issues that made Noah and Olwen children in need of aid, i.e., Bill's and Clara's domestic violence and substance abuse issues. We do not express an opinion whether the efforts toward the children were active, as we need not decide that issue at this time.

[20] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 761 (Alaska 2009).

ICWA standard. This presents a question of law."[21] We review conclusions of law de novo, including whether the court's findings satisfy the requirements of ICWA.[22]

### 1. OCS's testimony was insufficient to demonstrate active efforts.

Bill's and Clara's argument that OCS did not demonstrate active efforts by clear and convincing evidence is based primarily on the "vague testimony" of the OCS caseworker. To support its showing of active efforts, OCS admitted into evidence the family case plan and contact plan; otherwise, OCS's demonstration of active efforts relied primarily on the caseworker's testimony.

The caseworker testified that OCS involvement "was ongoing through the [T]ribe or through OCS for quite some time prior to removal," but she could not testify as to the approximate date of the first report of harm. The caseworker also could not speak to the last time Clara participated in treatment, as the caseworker had not received a recent report from the Tribe's treatment center. The caseworker admitted she herself had not spoken to Clara about case planning in "quite some time." Similarly, when asked if OCS ever talked to Bill about getting a substance abuse assessment, the caseworker replied, "I did not. I know that the [T]ribe has worked with him. . . . They provide services on the island, so we work very closely with them, and I know that those conversations were had"; but she could not provide further detail about what those efforts entailed.

The caseworker's testimony throughout the termination trial is riddled with similarly generic statements that defer to the Tribe's actions without documentation by OCS or the Tribe and without testimony from the Tribe to support when and in what

---

[21] *Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 556 (Alaska 2017).

[22] *Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 105 (Alaska 2017).

context those efforts occurred. As we have repeatedly said, "[a]ctive efforts occur 'where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.' "[23] Here, OCS recommended inpatient treatment for both parents — did it help them identify appropriate programs and complete the necessary paperwork to apply? OCS recommended parenting classes — did it provide Bill and Clara a schedule for those classes, give reminders, or check in afterward to confirm their attendance? OCS recommended domestic violence classes — after Bill and Clara completed what was available on-island, did OCS connect them to other resources to continue this education?[24] The answers to these questions are unclear on the record before us.[25]

Like the superior court, we are underwhelmed by the quality of OCS's testimony. We agree with the court's observation that OCS "made a rather lackadaisical effort" and "put on a skeletal case about [its] required active efforts." The superior court was rightly concerned to doubt OCS's demonstration of active efforts. We acknowledge that the superior court concluded that OCS met its burden due in large part to "the consideration the Court is to give to the parents' demonstration of an unwillingness to

---

[23]    *N.A. v. State*, 19 P.3d 597, 602-03 (Alaska 2001) (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

[24]    The OCS caseworker testified Bill and Clara completed the domestic violence education available on St. Paul. She mentioned the idea of trying an online program, but it does not appear she followed through with connecting either parent to such a service.

[25]    We do not intend to convey OCS *must* have taken all these actions for its efforts to be considered active. These questions are relevant queries a court *might* consider and are posed solely to demonstrate the inadequacy of OCS's evidentiary support.

change or participate in rehabilitative efforts."[26] While this principle remains valid, the parents' lack of effort does not excuse OCS's failure to make and demonstrate its efforts. Even considering the parents' lack of participation, there is simply insufficient evidence in the record to show that OCS made active efforts. It was legal error for the superior court to conclude by clear and convincing evidence that OCS made active efforts to reunify the family.

### 2. Active efforts are not documented in detail in the record.

A related but distinct problem is OCS's failure to document its active efforts in detail in the record.[27] While documentation is related to OCS's duty to *make* active efforts, documenting those efforts is a separate responsibility. The act of documentation is not itself an "active effort";[28] rather, it is a mechanism for OCS and the

---

[26] On this point, the superior court relied in particular on the following language:

> "[A] parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts." Failed attempts to contact the parent or obtain information from her may qualify as active efforts if the parent's evasive or combative conduct "rendered provision of services practically impossible." And "[i]f a parent has a long history of refusing treatment and continues to refuse treatment, OCS is not required to keep up its active efforts once it is clear that these efforts would be futile."

*Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432-33 (Alaska 2015) (alterations in original) (first quoting *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990-91 (Alaska 2002); and then quoting *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 101 (Alaska 2008)).

[27] 25 C.F.R. § 23.120(b) (2018).

[28] *Compare* 25 C.F.R. § 23.2 (providing a list of 11 examples of what active
(continued...)

court to ensure that active efforts have been made.[29]  Documentation is required by ICWA and is critical to compliance with ICWA's purpose and key protections.[30]  The CINA statute also requires OCS to document its provision of family reunification support services.[31]  But such documentation is woefully missing here.[32]

---

[28]  (...continued) efforts may include, such as "[c]onducting a comprehensive assessment of the circumstances of the Indian child's family," "[i]dentifying appropriate services and helping the parents to overcome barriers," and "[c]onsidering alternative ways to address the needs of the Indian child's parents"), *with* 25 C.F.R. § 23.120 (setting forth in a separate section of the Regulations the requirement that the state agency and the court document active efforts as a means to ensure that these efforts have been made).

[29]  *See* BUREAU OF INDIAN AFF., GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 44 (Dec. 2016), https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf ("The rule . . . requires the court to document active efforts in detail in the record. . . . State agencies also need to help ensure that there is sufficient documentation available for the court to use in reaching its conclusions regarding the provision of active efforts.").  While the BIA Guidelines are non-binding, we have looked to these guidelines in the past for assistance in interpreting ICWA.  *See, e.g.*, *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 781-82 (Alaska 2012).

[30]  *See* Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,816 (June 14, 2016) (codified at 25 C.F.R. pt. 23); 25 C.F.R. § 23.120(b).

[31]  AS 47.10.086(a)(3).

[32]  On appeal, OCS cites pervasively in its brief to evidence that was *not* admitted at the termination trial and therefore cannot be relied upon by this court.  *See Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 856 (Alaska 2013) ("On appeal, we review a trial court's decision in light of the evidence presented to that court."); *Paula E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 422, 430 (Alaska 2012) ("[W]e will consider only the evidence that was admitted at the hearing.").

For example, OCS cites to its emergency petition for adjudication of a child
(continued...)

We also reiterate that the superior court warned OCS at the February 2016 adjudication hearing "that this is as little over the line of active efforts as you can get while crossing the line." It escapes comprehension why, in the face of such an explicit warning, OCS failed to rectify its deficiencies and failed to create the documentation and provide the witness testimony necessary to support what efforts it and the Tribe did make.[33] For example, OCS contracted with the Tribe to provide on-island services to Bill and Clara; it likely would have been helpful for the superior court to hear testimony from tribal representatives describing the efforts made to provide family support services, but

---

[32]    (...continued)
in need of aid, hearing log notes, Clara's substance abuse assessment, testimony from the adjudication hearing, and the OCS report for the permanency hearing. OCS did not seek to admit any of these items into evidence at the termination trial, nor did it ask the superior court to take notice of earlier testimony.

This attempt by OCS to bolster its documentation of active efforts only serves to further illustrate the paucity of evidence presented at the termination trial. Additionally, even if evidence and testimony from the February 2016 adjudication hearing had been admitted at the October 2017 termination trial, it would not substantiate OCS's efforts during the intervening twenty months.

[33]    It is theoretically possible that adequate testimony regarding OCS's active efforts might suffice even if the documentation of those efforts is sparse. We have held that in certain circumstances the superior court may "credit OCS caseworkers' sworn testimony about the extent of services provided . . . without requiring additional documentation." *Caitlyn E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 399 P.3d 646, 656 (Alaska 2017) (dismissing argument that the record should have included "more detailed reports" from the mother's stay in a long-term inpatient treatment facility). But without supporting documentation, the quality of a caseworker's testimony must be sufficient to meet the clear and convincing evidence standard; in this case, it was not sufficient.

none was proffered. OCS also could have provided the court with its ORCA documentation[34] regarding actions taken to reunify the family, but it did not.

On the record before us, there is insufficient evidence to sustain an active efforts finding under a clear and convincing evidence standard. Accordingly, we reverse the superior court's active efforts finding, vacate the court's termination order, and remand for further proceedings. As this case is governed by the 2016 BIA Regulations, on remand the superior court should expressly analyze OCS's efforts under those standards. Finally, we are mindful of the fact that Noah and Olwen have been in OCS custody since 2015 and of the importance of achieving permanency for these young children. Therefore, the superior court and OCS should expedite further proceedings.

## V. CONCLUSION

We REVERSE the superior court's active efforts finding, VACATE the order terminating Bill's and Clara's parental rights to Noah and Olwen, and REMAND this case for further proceedings consistent with this opinion.

---

[34] The Online Resource for the Children of Alaska (ORCA) is a data system in which OCS caseworkers document case notes, such as family contact.