NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| FLOYD T., ) | |
| ) | Supreme Court No. S-18757 |
| Appellant, ) | |
| ) | Superior Court No. 1KE-21-00016 CN |
| v. ) | |
| ) | MEMORANDUM OPINION |
| STATE, DEPARTMENT OF FAMILY ) | AND JUDGMENT* |
| AND COMMUNITY SERVICES, ) | |
| OFFICE OF CHILDREN'S ) | No. 2009 – January 31, 2024 |
| SERVICES, ) | |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, Katherine H. Lybrand, Judge.

Appearances: Courtney Lewis, Anchorage, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Noah I. Star, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee State of Alaska. Notice of nonparticipation filed by Matthew Tallerico, Jason Weiner & Associates, P.C., Fairbanks, for Appellee Bertie S.

Before: Carney, Borghesan, and Henderson, Justices. [Maassen, Chief Justice, and Pate, Justice, not participating.]

---

\*      Entered under Alaska Appellate Rule 214.

## I.  INTRODUCTION

A father challenges the termination of his parental rights, arguing that the Office of Children's Services (OCS) failed to provide active efforts to reunite his family pursuant to the Indian Child Welfare Act (ICWA).  Seeing no error in the superior court's active efforts determination, we affirm the termination order.

## II.  FACTS AND PROCEEDINGS

### A.  OCS's Initial Removal Of Camilla From Her Parents

In November 2020 Camilla T.[1] was born prematurely and tested positive for methamphetamine.  Camilla's mother, Bertie S., also tested positive for methamphetamine.  Camilla's father, Floyd T., is affiliated with a Tribe and Camilla is an Indian child as defined by ICWA.[2]

Shortly after birth in Ketchikan, Camilla was medevacked to the University of Washington due to her premature birth, drug exposure, and respiratory distress.  OCS met with the parents in the hospital.  Camilla was released from the hospital into the parents' care.  The Tribe offered the parents food vouchers and a crib in December 2020, but the parents never picked up the crib.  In early January 2021 OCS staff and a Tribal representative met with the parents.  The parents agreed to drug testing, and OCS provided referrals.  But the parents never attended the drug testing, and they missed a doctor's appointment for Camilla in early January.

In late January OCS and Tribal representatives tried to meet with the parents at their home, but Floyd refused to answer.  OCS caseworkers attempted to reach the parents via phone twice in January and twice in February, but all attempts

---

[1]    We use pseudonyms for all individuals in this case.

[2]    *See* 25 U.S.C. § 1903(4) (defining an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

failed. On February 11 Camilla's doctor in Ketchikan informed OCS that the parents missed Camilla's appointment for a necessary vaccine. That same day OCS filed an emergency petition for temporary custody of Camilla and removed her from her parents' custody. When OCS removed Camilla, she was dehydrated and had a severe diaper rash. OCS placed Camilla in a foster home.

**B.    OCS's Reunification Efforts Following Removal**

After removal, OCS continued to work with the Tribe, meeting biweekly with Tribal representatives to try to better communicate with and provide services to the parents.

In April 2021 OCS emailed Bertie with copies of case plans and requested to meet with the parents to discuss the plans. The case plans referred the parents to parenting classes, substance abuse and mental health assessments, and job services, and included specific service providers and their contact information. In early May 2021 the OCS caseworker assigned to Camilla's case followed up with multiple calls to the parents. The caseworker scheduled a meeting with the parents in May, but Floyd asked to reschedule the meeting. In June the parents left a voicemail for the caseworker, and the caseworker texted with the parents and scheduled another meeting, which the parents missed.

Thereafter the caseworker continued to regularly attempt to contact the parents, often without success or response. The parents called the caseworker in July and the caseworker was unavailable for a meeting because she was out of town. The parents missed an internal administrative review OCS held in August. The caseworker called and texted the parents in September, arranging a meeting, but the parents did not attend the meeting. The caseworker then called the parents in October, with no response.[3] She was able to reach the parents by phone in November and she texted

---

[3]    The caseworker's testimony over two days of hearings is slightly inconsistent regarding parent contact for July, August, and October 2021.

them. She sent a letter, which included her contact information and a scheduled meeting, but the parents did not attend the meeting. In December the caseworker sent the parents another letter containing the caseworker's contact information and scheduled another appointment. The parents again failed to attend the appointment.

The caseworker mailed the parents another letter in January 2022 with a scheduled appointment and once again included the caseworker's contact information. The parents did not attend the meeting or respond to the letter. A caseworker stopped by the parents' home in January, with no answer. In February the same caseworker attempted to call the parents. OCS also mailed a letter with a referral for drug testing, and a caseworker stopped by the parents' home, again with no response. OCS updated the parents' case plans that month, although there were very few changes in light of the lack of progress. In March OCS sent another letter with a scheduled meeting time, which the parents did not attend. The assigned caseworker stopped by the parents' home in March but there was no answer.

During this period OCS arranged twice weekly supervised visitation between the parents and Camilla. Floyd and Bertie both attended these visitations consistently from May 2021 through October 2021, but their visitation thereafter became sporadic. Camilla's grandmother supervised the visitation.

C.      **Transition In OCS Caseworkers And Continued Reunification Efforts**

A new caseworker took over Camilla's case in April 2022. She continued to meet biweekly with the Tribe's representatives. Between April 2022 and March 2023 this caseworker attempted to contact the parents via phone calls, home visits, and letters, with some successful and many unsuccessful contacts. The caseworker also sent the parents updated case plans during this time period. The caseworker made monthly phone calls to the parents. The caseworker was not able to make telephone contact with or leave a message for the parents during this period because the parent's phone was

not in service. The parents called the caseworker back once in March 2023 at seven p.m. on the evening prior to the termination trial, and the caseworker did not answer.[4]

An OCS caseworker visited the parents' home in May, June, and July 2022. The primary caseworker spoke with Bertie when she visited the home in May, and Bertie indicated she did not want to participate in case planning. When the caseworker visited in July, she spoke with Floyd, who indicated that he also was not interested in case planning. Floyd provided the caseworker with a new phone number at that time, but when the caseworker later called this new number, it was not in service.

In early fall 2022 Floyd met with a family case manager from the Tribe. After the meeting the Tribe's case manager tried to follow up and contact Floyd several times, including by going to the parents' home, but Floyd did not answer. The Tribe's case manager had worked with Floyd previously and had had "a good working relationship with him," but Floyd did not respond to the Tribe's efforts to reach out to him regarding Camilla's case.

OCS did not track the frequency of the parents' visits in 2022 and 2023, but Camilla's foster mother later testified that the parents attended visits with Camilla consistently during the summer of 2022 and attended about half of the visits during 2023. Camilla's grandmother continued to attend and supervise the visits with Camilla.

### D.     Hearings and Termination Trial

Throughout the proceedings the superior court continued many hearings to try to make sure the parents could attend. The court held an adjudication and permanency hearing over two days in February and March 2022, and then a permanency hearing in June 2022. During these hearings the court addressed OCS's efforts toward the family and concluded those efforts were active.

---

[4]     It is not apparent from the record whether the caseworker had access to the phone that the parents called at that time of day.

In August 2022 OCS filed a petition for termination of the parents' rights. Over three days in March and April 2023 the superior court held a termination trial. The parents did not attend. The court heard evidence from the two primary OCS caseworkers that worked with the family, Camilla's foster parent, a child welfare expert addressing the risk of harm to Camilla should she return to her parents' home, an expert regarding the Tribe's customs and traditions,[5] and a Tribal representative. The State introduced case plans and case plan evaluations for the parents, letters from OCS to the parents, copies of drug testing referrals, Camilla's education and health records, and the child welfare expert's report. The parents did not present any evidence or witnesses at the termination trial.

### E.    Order Terminating Parental Rights

The court announced findings and conclusions on the record in April 2023, followed by a written order. The court found by clear and convincing evidence that Camilla was a child in need of aid for several reasons[6] and that the parents had not remedied the conduct placing Camilla at risk. The court also concluded that the evidence — including expert witness testimony — established beyond a reasonable doubt that returning Camilla to her parents would likely result in serious emotional or physical damage. And the court found by a preponderance of the evidence that termination of the parents' rights was in Camilla's best interests.

---

[5]    *See* 25 C.F.R. § 23.122(a) (2024) ("A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe.").

[6]    AS 47.10.011(1) (abandonment), (4) (failure to provide medical treatment), (6) (physical abuse), (9) (neglect), and (10) (substance abuse). The court noted in its abandonment finding that it would have been helpful for OCS to partner with the foster mother to keep a visitation log, but the court still found there was sufficient evidence to find abandonment.

Finally the court determined that OCS had provided active efforts to reunite the family. As an initial matter, the court noted that OCS and the Tribe attempted to work with the parents and to provide them with resources before Camilla was eventually removed. Additionally the court found that after Camilla was removed:

> OCS made case plans for the parents, but the parents did not engage. OCS made efforts to contact the parents in person, by phone, and by letter, but without engagement. OCS offered grandparent visitation weekly as well as weekly visitation to the parents. The tribe made efforts to engage with the parents as well, but the parents chose not to have engagement with the tribe either.

The court found the OCS caseworkers credible in describing their efforts to contact the parents and the parents' lack of response. Having concluded that OCS made active but unsuccessful efforts to reunite the family, the superior court granted the petition to terminate parental rights.

Floyd appeals the termination order.[7]

## III. STANDARD OF REVIEW

Whether OCS provided active efforts under ICWA " 'is a mixed question of law and fact.' We review the superior court's findings of fact for clear error, but 'we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA.' "[8] "Factual findings are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party leaves us with a definite and firm

---

[7] Bertie does not appeal.

[8] *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 981 (Alaska 2019) (quoting *Caitlyn E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 399 P.3d 646, 654 (Alaska 2017)).

conviction that a mistake has been made."[9]  Therefore, ordinarily we will not overrule the superior court's factual findings because of conflicting evidence.[10]

## IV.   DISCUSSION

Floyd raises two arguments related to active efforts.  First he argues OCS's efforts were insufficient to meet the active efforts requirements.  Second he contends OCS inadequately documented its active efforts.  But because OCS provided active efforts to reunite the family, and adequately documented those efforts, we affirm the superior court.

### A.   OCS Provided Active Efforts.

Under ICWA, when OCS seeks to terminate parental rights to "an Indian child under State law [OCS] shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[11] "[A]ctive efforts will be found when OCS 'takes the client through the steps of the plan rather than requiring that the plan be performed on its own,' but not when 'the client must develop his or her own resources towards bringing [the plan] to fruition.' "[12] Nevertheless, "the active efforts requirement does not require perfection."[13]

---

[9]     *Marcia V. v. State, Off. of Child.'s Servs.*, 201 P.3d 496, 502 (Alaska 2009) (citing *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[10]     *Brynna B.*, 88 P.3d at 529.

[11]     25 U.S.C. § 1912(d).

[12]     *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013) (alteration in original) (first quoting *N.A. v. State, Div. of Fam. & Youth Servs.*, 19 P.3d 597, 602-03 (Alaska 2001); and then quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1114 (Alaska 2010)).

[13]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011).

A parent's unwillingness to cooperate with OCS can impact a court's active efforts analysis in three ways: "(1) it can excuse *further* active efforts once it is clear those efforts would be futile; (2) it can excuse 'minor failures by [OCS]'; and (3) it can influence what actions qualify as active efforts."[14] However, "[a] parent's lack of cooperation or unwillingness to participate in treatment does not excuse OCS from making active efforts and proving that it has made them."[15] In this way, an active efforts determination "turns on OCS's efforts."[16]

Here the superior court concluded that OCS's efforts to reach the parents via mail, text message, phone, and in person, along with engaging with the Tribe and arranging visitation, were sufficiently active to meet ICWA's standard.[17] Floyd argues OCS failed to sufficiently contact the parents in person, the method of contact that worked best for them. He contends OCS chose the more passive method of telephone communication when OCS knew the parents struggled to afford a phone line, and that caseworkers should have been more active in seeking them out by walking to their home.

---

[14]     *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 562-63 (Alaska 2022) (alteration and emphasis in original) (first citing *Wilson W. v. State, Off. of Child.'s Servs.*, 185 P.3d 94, 97, 101 (Alaska 2008); then quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1021 (Alaska 2009); and then citing *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432-33 (Alaska 2015)).

[15]     *Id.* at 562 (citing *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 (Alaska 2019)).

[16]     *Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1072 (Alaska 2018).

[17]     We observe "it is particularly difficult to assess active efforts retrospectively over a period of many years, and an approach involving more regular review . . . increase[s] the likelihood that problems can be timely resolved and disagreements mitigated — goals all parties should share." *Mona J.*, 511 P.3d at 564. Here we commend the superior court for making regular active efforts findings at two status and permanency hearings along with at the termination trial.

But the record supports the superior court's findings that OCS regularly and meaningfully attempted to communicate with and provide services to the parents through a variety of means. OCS's efforts included consistent outreach to the parents both before and after Camilla was removed from their custody. Moreover the caseworker testimony indicates OCS made efforts to reach the parents via phone, letter, email, text message, Facebook message, or through home visits at least once a month throughout Camilla's time in OCS custody.[18] Over the 27 months OCS had custody of Camilla, caseworkers visited the parents' home six times, but these visits resulted in just two contacts with the parents. And when the parents did answer the door, they expressed they did not want to work with OCS.

OCS also sent three case plans and two case plan evaluations to the parents over the two years it had custody of Camilla. The case plans contained referrals to parenting classes, substance abuse and mental health assessments, and job services, and identified particular service providers along with the providers' contact information. Moreover OCS repeatedly attempted to meet and discuss with the parents how to move forward with their case plans, but the parents refused efforts to meet or discuss case planning. Understanding that the parents may prefer to work with the Tribe, OCS regularly met and worked with the Tribe to try to communicate with and provide services to the parents.[19] Indeed, the Tribal representative that attempted to

---

[18] However, OCS testimony is conflicting so there may not have been contact in March, July, August, and October 2021 by the clear and convincing evidence standard. Looking at the record as a whole, though, this four-month period is insignificant in light of OCS's other active efforts. *See Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1268-69 (Alaska 2008) (looking to record as a whole and concluding OCS made sufficient active efforts even though it failed to make active efforts for three-month period).

[19] Actions by the Tribe do not supplant OCS's active efforts obligation, but OCS's collaboration with the Tribe supports an active efforts finding. *See* 25 C.F.R. §

communicate and work with Floyd was a person with whom he had previously had a positive relationship. In spite of these efforts, the parents refused to respond to or work with OCS or the Tribe.

Considered as a whole and within the context of this case, OCS's efforts were active. Although OCS could have attempted more frequent visits to the parents' home, especially during the period that Floyd's phone was not working, the record indicates that OCS's visits to the home were not all that productive, resulting either in no contact with the parents or in the parents refusing to discuss case planning.[20] OCS attempted to communicate with the parents and help them to work on their case plans in a number of ways, referred the parents to services and tried to have follow-up meetings with the parents, arranged for the parents and grandparents to visit with Camilla, and collaborated with the Tribe to try to engage with the parents.[21] These efforts, though not perfect, were sufficient to satisfy the active efforts standard.[22]

## B. OCS Adequately Documented Its Active Efforts.

ICWA regulations require OCS to document active efforts "in detail in the record."[23] Documenting active efforts is a related, but separate, responsibility from

---

23.2 (2024) ("Active efforts . . . may include . . . [i]dentifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family.").

[20] *See id.* ("Active efforts are to be tailored to the facts and circumstances of the case.").

[21] *See Mona J.*, 511 P.3d at 565-66 (focusing on OCS's efforts to work with mother and concluding OCS provided active efforts despite mother's lack of cooperation).

[22] *See Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011) ("[T]he active efforts requirement does not require perfection.").

[23] 25 C.F.R. § 23.120(b) (2024). The CINA statute also requires documentation of active efforts. AS 47.10.086(a)(3).

OCS's duty to make active efforts.[24] Documenting active efforts "is a mechanism for OCS and the court to ensure that active efforts have been made."[25] Documentation "is critical to compliance with ICWA's purpose and key protections."[26]

In *Bill S. v. State*, we reversed the superior court's order terminating parental rights because OCS had failed to sufficiently document its efforts.[27] In that case, the only evidence OCS had supplied regarding its efforts amounted to a single family case plan and contact plan along with a caseworker's testimony.[28] The caseworker's testimony consisted of generic statements about OCS and tribal involvement without specific dates or information about referrals or services.[29] We observed that OCS could have provided testimony from Tribal representatives describing their efforts and OCS could have provided documentation from OCS's online database.[30] We concluded that the documentation of active efforts was "woefully missing," leaving an uncertain picture of what efforts OCS made to reunify the family.[31]

Floyd contends that, just as in *Bill S.*, OCS failed to adequately document its efforts to reach the parents in this case. He asserts that the OCS caseworker testimony was vague and insufficient to establish active efforts. Floyd notes that

---

[24] *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 (Alaska 2019).

[25] *Id.* (citing U.S. DEP'T OF THE INTERIOR, BUREAU OF INDIAN AFF., GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 44 (2016), https://www.bia.gov/sites/bia.gov/files/a ssets/bia/ois/pdf/idc2-056831.pdf).

[26] *Id.* (citing Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,816 (June 14, 2016) (codified at 25 C.F.R. pt. 23); 25 C.F.R. § 23.120(b)).

[27] *Id.* at 983-84.

[28] *Id.* at 982.

[29] *Id.*

[30] *Id.* at 984.

[31] *Id.* at 982-83.

caseworker testimony conflicted at times, and he points out that OCS did not submit copies of all of the letters that caseworkers testified they sent to the parents.

But this matter is unlike *Bill S.* in that OCS provided more detailed testimony and greater documentary evidence establishing its efforts here.[32] OCS introduced materials going beyond case plans, admitting copies of drug testing referrals and copies of letters sent from OCS to the parents. It also relied on caseworker testimony that, while conflicting in isolated respects, provided detailed information outlining the efforts directed toward the family over time. Moreover, OCS called a Tribal representative to provide additional testimony that detailed OCS's and the Tribe's attempts to reach and provide services and assistance to the parents. Documentation of active efforts "is critical to compliance with ICWA's purpose and key protections," and here OCS could have set forth more thorough documentation.[33] Ultimately, however, the documentation produced by OCS, considered alongside the testimony of the involved caseworkers and the Tribe, was sufficient to support the superior court's determination that OCS made active efforts.

## V. CONCLUSION

We AFFIRM the termination order.

---

[32] *See id.* at 982-83.

[33] *See id.* at 983 (citing Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,816 (June 14, 2016) (codified at 25 C.F.R. pt. 23); 25 C.F.R. § 23.120(b) (2024)).