*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MIRANDA T., ) | |
| ) | Supreme Court No.: S-18190 |
| Appellant, ) | |
| ) | Superior Court No.: 3AN-19-00228 CN |
| v. ) | |
| ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT ) | |
| OF HEALTH & SOCIAL SERVICES, ) | No. 7643 – February 24, 2023 |
| OFFICE OF CHILDREN'S SERVICES ) | |
| and BISHOPE A., ) | |
| ) | |
| Appellees. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Jennifer S. Henderson, Judge.

Appearances: Amanda Harber, 49th State Law, LLC, Soldotna, for Appellant. Ryan A. Schmidt, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee Office of Children's Services. Kelly R. Taylor, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellee Bishope A. Laura Hartz, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Carney, and Borghesan, Justices. Carney, Justice, dissenting. [Henderson, Justice, not participating.]

WINFREE, Chief Justice.

# I. INTRODUCTION

A mother appeals the superior court's entry of a disposition order in child in need of aid (CINA) proceedings. She contends that the court erred by moving forward with an adjudication hearing without having considered her request for a review hearing on a previously stipulated temporary custody and placement arrangement. She contends that the court also erred by later refusing to enforce two subsequent agreements she had reached with the Office of Children's Services (OCS) about placements for her daughter. She further contends that the evidence does not support the disposition order's predicate findings that (1) OCS had made sufficiently active efforts to reunify the family and (2) removal of the daughter from the family home was necessary to avoid harm to her. We reject the mother's claims of error and affirm the superior court's disposition order.

# II. FACTS AND PROCEEDINGS

During the CINA proceedings underlying this appeal, Bishope A.[1] was a nearly 17-year-old minor. Bishope is an Indian child[2] under the Indian Child Welfare Act (ICWA);[3] her Tribe intervened and participated throughout the proceedings.[4]

---

[1]    We use pseudonyms to protect the parties' privacy.

[2]    *See* 25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

[3]    25 U.S.C. §§ 1901-1963. ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

[4]    *See* 25 U.S.C. § 1911(c) (authorizing child's Tribe to intervene in state court child custody or protection proceedings).

Bishope has both a guardian ad litem (GAL) to advocate for her best interests[5] and an attorney to advocate for her personal interests.[6] Miranda T. adopted Bishope in 2015; the current CINA proceedings began in April 2019 after OCS was contacted because Bishope, who had been arrested and taken to a juvenile facility, refused to return home to Miranda.

### A. Relevant Early Stages Of A CINA Case

A brief summary of a CINA case's three early stages will provide context for the following discussion of the proceedings in this matter. A CINA case generally begins with OCS filing a petition to adjudicate a child as a child in need of aid under AS 47.10.011.[7] OCS sometimes will take emergency custody of a child believed to be in need of aid and then immediately file a petition for adjudication and temporary custody pending the adjudication hearing.[8] Other times OCS will file an adjudication petition with a request for temporary custody or legal supervision of the child pending the adjudication hearing.[9] In either event, OCS must show that there is probable cause

---

[5]   *See* AS 25.24.310(c) (requiring "guardian ad litem when, in the opinion of the court, representation of the child's best interests, to be distinguished from preferences, would serve the welfare of the child"). At oral argument before us, the GAL's attorney introduced the GAL and noted that he had been serving as Bishope's GAL for over a decade. We are compelled to express our great appreciation and respect for the GAL's efforts on Bishope's behalf over the years.

[6]   *See* AS 25.24.310(a) (providing court may appoint counsel to represent a minor in "proceeding involving the minor's welfare").

[7]   AS 47.10.011 provides that a court may determine a child is in need of aid if the child has been subjected to any of 12 enumerated situations.

[8]   *See* AS 47.10.142 (providing for emergency custody of child in certain circumstances and setting out timelines for adjudication petition); CINA Rule 6 (implementing AS 47.10.142).

[9]   *See* CINA Rule 7 (regarding petition for adjudication) and CINA Rule 10 (regarding temporary custody hearings).

to believe the child is in need of aid or the case will be dismissed.[10] Once probable cause is established and a temporary custody or supervision order is in place, any party may request that the temporary order be reviewed due to a change of circumstances.[11]

If probable cause is established and an order for temporary custody or supervision is issued, the case moves to the adjudication stage. An adjudication hearing must be completed within 120 days of the probable cause determination, although continuances may be granted for good cause while taking into account the effect of delay on the child.[12] If at the hearing the court finds by a preponderance of the evidence that the child is in need of aid, the court will order that the child be committed to OCS's temporary custody pending a disposition hearing.[13] If, as a part of the adjudication order, the court approves removal of an Indian child from the home, the court must make certain removal findings.[14]

---

[10] *See* CINA Rule 6(b) (regarding necessity of probable cause to issue order for emergency temporary custody of child in need of aid); CINA Rule 10(c) (regarding necessity of probable cause for temporary custody order). Probable cause "is established where reasonably trustworthy information would justify a prudent person's belief that the child is in need of aid." *In re J.A.*, 962 P.2d 173, 176 (Alaska 1998). This essentially reflects "a fair probability or substantial chance," *id.*, less than the preponderance of the evidence showing required at an adjudication hearing, *cf.* CINA Rule 15(c).

[11] CINA Rule 10(e)(1).

[12] AS 47.10.080(a); CINA Rule 10(d) (regarding subsequent hearings).

[13] CINA Rule 15(f)(1).

[14] *See* CINA Rule 15(f)(2); CINA Rule 10.1(b)(1) (requiring, at each hearing authorizing removal of Indian child from parent or Indian custodian, findings determining that OCS complied with ICWA's placement requirements under 25 U.S.C. § 1915(b) and made active efforts to provide remedial services and rehabilitative programs to the family under 25 U.S.C. § 1912(d)). If those findings cannot be made on the record then before the court, the child is not necessarily returned to the parent or

The next stage of a CINA case is a disposition hearing to determine whether OCS's custody of the child shall continue and, if so, the appropriate placement for the child during the ongoing CINA proceedings.[15]  The court is allowed, but not required, to combine an adjudication hearing and a disposition hearing.[16]  Assuming certain predicate findings are made after the disposition hearing, the court shall place the child in OCS's custody for up to 2 years but not extending past the child reaching age 19.[17]  The court may approve removal of an Indian child from the child's home only if the court makes the same removal findings required at the adjudication stage (regarding placement preferences and active efforts)[18] and also finds "clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[19]

B.      **Opening Proceedings**

OCS filed a non-emergency petition for adjudication that Bishope was a child in need of aid and sought an order placing Bishope under OCS's temporary legal supervision.  OCS asserted that Bishope was in custody at an Anchorage juvenile facility but was ready for release after dismissal of delinquency charges against her. OCS asserted that Bishope did not want to return to Miranda's care and threatened to

---

Indian custodian; temporary custody will be extended and the disposition hearing postponed until the findings can be made.  CINA Rule 10.1(b)(2); CINA Rule 17(c).

[15]      CINA Rule 17(a).

[16]      CINA Rule 10(d).

[17]      AS 47.10.080(c)(1).

[18]      CINA Rule 17(c).  If those findings cannot be made, the disposition order must be postponed until the findings can be made; the child remains in OCS's temporary custody pending the disposition order.  *Id.*

[19]      25 U.S.C § 1912(e); CINA Rule 17(d)(2).

harm Miranda if she were returned. OCS said that it was seeking only legal supervision while Bishope was in juvenile custody, that it intended to establish a case plan with Miranda and determine appropriate services, and that it would seek a partial delegation of authority for Miranda to allow Bishope to be released to live with a family friend in Anchorage who had been a previous foster placement.

The court issued an order for OCS's temporary supervision based on the court's finding of probable cause that Bishope was a child in need of aid. The order provided for placement with Miranda with a delegation of parental authority from Miranda to the family friend.[20]

In July OCS filed a supplemental petition for adjudication and temporary custody of Bishope rather than supervision. OCS described continued difficulties with Bishope and Miranda's relationship, Bishope's running away from the family friend's home, Bishope's treatment with her therapist, and Bishope's departure from Anchorage to her biological mother's home. OCS sought temporary custody, but not removal findings, because Bishope's biological mother then had a delegation of parental rights from Miranda. Without making additional findings, other than it was in Bishope's best interests, the superior court granted temporary custody to OCS pending further proceedings.

Miranda and OCS later agreed to the superior court making "provisional findings . . . solely and for the limited purpose of facilitating . . . foster placement of the child," preserving Miranda's right to later contest removal.[21] It appears that, for purposes of the agreement, Miranda agreed Bishope was a child in need of aid under

---

[20] *See* Alaska CINA Rule 10(c)(2) ("The court shall order the child placed in the temporary custody of [OCS] or order the child returned to the home with supervision by [OCS] if the court finds probable cause to believe that the child is a child in need of aid under AS 47.10.011.").

[21] *See* CINA Rule 14(c) ("Subject to approval by the court, parties may stipulate to any matter.").

AS 47.10.011(5) (regarding child who has "a substantial risk of physical or mental injury" due to habitual absence from the home or refusing available care). The court issued an order with provisional removal findings "subject to challenge at a later proceeding."

In October, after OCS placed Bishope in a residential treatment home rather than in the contemplated foster care, Miranda moved for a review hearing due to changed circumstances in Bishope's placement. Miranda specifically requested formal removal findings. Bishope, the GAL, the Tribe, and OCS opposed Miranda's motion. In late November the court declined to grant immediate review and ordered that removal be addressed at the upcoming adjudication hearing, later referring to "overlapping" factual information and noting that combining review "would be a productive use of court time."

Although the court apparently delayed the adjudication hearing to allow the parties an opportunity to mediate a "path forward," the hearing ultimately started about two months later, on January 27, 2020. The court denied OCS's request for a continuance to allow an expert psychiatrist, Dr. Aryeh Levenson, to conduct a comprehensive evaluation of both Bishope and Miranda, but the court said it would consider allowing the evaluations to go forward for presentation later in the hearing. The court then heard some witness testimony. The hearing resumed on February 4. At the end of that hearing day the parties discussed the next available hearing day, focusing on March 11. During these discussions OCS said that Dr. Levenson had been working on a report. The court stated that it would require a motion to determine whether the additional expert testimony would be allowed.

The court held a status hearing on February 24 to discuss how to handle potential testimony from Bishope. OCS advised that Dr. Levenson was working hard on his evaluations, that he would not be available in person on March 11, but that he could be available later in March. The court requested that the parties provide

information from mental health professionals regarding testimony from Bishope and file position papers on allowing Dr. Levenson's report and testimony.

The court held another status conference on March 9, primarily to discuss procedures for Bishope's testimony. The court noted that OCS had filed a motion to allow Dr. Levenson to testify at the trial, although it was made clear at the hearing that Dr. Levenson's report had not yet been provided to all parties. Regarding Bishope's testimony, the court found that pressuring Bishope "to testify in the presence of [Miranda] is likely to cause material psychological harm to her" and would "inhibit her ability to express her testimony." The court proposed having Bishope's testimony conducted in judicial chambers, with an arrangement allowing Miranda to hear the testimony and submit potential questions. Then, regarding Dr. Levenson, the court said that its inclination — but not its final ruling — was to allow Dr. Levenson to testify at some point. The court left its final decision until the parties had been able to review Dr. Levenson's report and could articulate positions favoring or opposing his testimony.

### C. Levenson Report; Miranda And OCS's Stipulated Agreement

Dr. Levenson's detailed report, based on record reviews and interviews with Bishope, Miranda, and others, was made available before the March 11 hearing. Dr. Levenson concluded that Bishope suffered "deep psychological effects of developmental trauma and neglect" manifesting "in deficits in emotional regulation, interpersonal trust and capacity to develop and maintain strong secure attachment bonds." But he also described Bishope as able to be "an engaging and endearing adolescent[,] energetic[,] hard working[, and having] a good sense of humor." He mentioned that others described her as "athletic, musical, artistic and creative," and he noted her "capacity to develop peer relationships and relationships with adults."

Dr. Levenson described Miranda as having a "very rigid, at times demanding and controlling personality style that contributed to conflicts between her and her daughter." He acknowledged that Miranda "is dedicated[,] cares deeply about

[Bishope, and] is seeking to better herself." Dr. Levenson reported that "the way [Miranda] interacted with [Bishope], the manner in which [Miranda] advocated for [Bishope], and [Miranda's] inability to understand how her behaviors/attitudes impact others" were a problem. He noted that Miranda's parenting style and potential personality disorder led to friction between her and some of Bishope's treatment professionals.

Dr. Levenson called the combination of factors "explosive." He detailed how Miranda's interpersonal and parenting styles caused "[Bishope] to feel exhausted/exasperated" and respond by "resort[ing] to what she knows — violence to escape." Dr. Levenson was somewhat hopeful about both's abilities to improve, but he also expressed concern that "despite [previous treatment], the situation hasn't improved, it has deteriorated."

Dr. Levenson suggested two treatment options for Bishope. He first recommended "a long[-]term specialized treatment facility that does focus on development trauma and attachment disorders and includes a very intensive and long[-]term parental psychotherapy component." He did not recommend forced visitation or reunification as a therapeutic goal, but he thought treatment could contribute toward an improved relationship. He "strongly believe[d] that OCS need[ed] to maintain custody authority" but acknowledged that Miranda's interest in "specialty programs" was appropriate. Dr. Levenson "hesitate[d] to offer a second option," indicating that it would be less effective and unlikely to be available in Alaska. He nonetheless discussed "placing [Bishope] in a long[-]term[,] highly skilled therapeutic foster care home and utiliz[ing] the current treatment providers . . . for ongoing care in a very intensive manner while providing more skilled wrap[-]around services." He noted that Miranda would have to give up custody and "put her efforts in her own mental health care." Dr. Levenson encouraged Miranda and OCS to "work together to find a solid treatment plan" instead of litigating. He said that "[f]or real and/or imagined intrapsychic reasons" Bishope would react poorly to "the mere knowledge that her

mother is controlling her treatment" and he concluded that it was "very unlikely that [OCS], in the near future[,] can reunify" the two.

After this report was released, Miranda and OCS entered into a stipulated adjudication agreement announced in court on March 11.[22] The thrust of the agreement was that — to start Bishope in Dr. Levenson's first treatment recommendation as soon as possible — Miranda agreed that Bishope was a child in need of aid and that removal findings could be made under certain terms. But the parties still would proceed to a disposition hearing at which the court would have to make additional findings, particularly those required under ICWA. The underlying terms supporting Miranda's agreement related to OCS's commitments: to follow Dr. Levenson's recommendation that Bishope be placed at a long-term specialized treatment facility; to maintain its custody of Bishope and pay for all necessary treatment; to allow Miranda to communicate directly with Bishope's treatment provider regarding routine treatment; to allow Miranda to give information to and receive non-privileged information from Bishope's therapist; and to provide case planning for Miranda to work on her own issues identified in Dr. Levenson's report. When Miranda and OCS presented their stipulated agreement to the court, the GAL and the Tribe urged OCS to work on both of Dr. Levenson's treatment recommendations and opposed being "lock[ed] . . . into any dispositional plan."

The court expressed concern about a stipulation not agreeable to all parties and gave the parties an opportunity to confer and reach an acceptable written stipulation. The hearing reconvened an hour or so later, and a typed stipulation with handwritten modifications was presented to the court. After testimony from Miranda, further modifications, and acknowledgment that Bishope, the Tribe, and the GAL did not agree with certain aspects of the stipulation, the stipulation was signed by all but

---

[22]    *See* CINA Rule 14(b) (regarding requirements for adjudication or disposition stipulations).

Bishope and her attorney (who had been unable to consult with Bishope). The court accepted the stipulation as presented, with the disagreements noted, and then discussed scheduling a disposition hearing.

OCS ultimately reneged on the agreement with Miranda, citing "tricky" administrative restrictions on out-of-state placements and pandemic pressures. OCS placed Bishope at an in-state foster home, and shortly thereafter OCS acknowledged to the court that it "could not follow through with what it had agreed to in March." OCS also later acknowledged to the court that its representatives "were not fully aware of Alaska Medicaid requirements" and that they "should have looked into these requirements before entering into the stipulation." OCS called this an error and said parts of the "stipulation r[a]n afoul of Alaska Medicaid requirements."

During this time Bishope struggled at her placements. She was discharged from a residential treatment home for repeatedly running away, placed into two emergency homes without proper safety measures, and then placed with a family friend with whom she had previously had a positive experience but who eventually requested additional OCS support.

**D.     Subsequent Stipulated Agreement And The Cohen Letter**

Miranda and OCS negotiated an amended agreement, covering both adjudication and disposition, and presented it to the court in June. Under this agreement Miranda was responsible for applying to "agreeable treatment facilit[ies]," custody would return to Miranda when Bishope was "actually physically taken into such a program," and various obligations were set out regarding information sharing and tone of communications. OCS represented that the agreement was made "with significant consultation . . . up the chain, including state-wide management," but acknowledged that "we may still end up needing a contested disposition because not all parties are going to be in agreement with the plan."

The other parties opposed this agreement more strongly than they had the previous one. The Tribe called the agreement "shocking" and "underhanded";

Bishope's attorney claimed to be "very concerned" by the contents of the agreement and the method by which it was conceived; and the GAL called OCS's actions "completely inappropriate and mind boggling," emphasizing that he was "completely opposed" to the agreement because it was not in Bishope's best interests. Apparently anticipating litigation, the court declined to "sign an order . . . [with] terms that would include essentially disposition . . . until there's fully been an opportunity to respond." OCS later framed its actions as "an effort to remedy" the March 2020 agreement but also "acknowledge[d] that it should have consulted with its expert and the child's treatment providers for recommendations."

Chantal Cohen, a therapist who had treated Bishope (and, at times, Miranda) in 2015 and for short stretches of time from 2018 to 2020, wrote a letter (with Bishope's permission) in September expressing serious concerns about Miranda's involvement in Bishope's care; the letter was distributed to the parties. Cohen said that, based on her professional experience and conversations with Bishope, she believed Bishope would "sabotage any attempt in treatment where she is required to engage with her mother." Cohen said she was "very concerned" about Bishope's safety and warned that "mother-daughter interactions now place Bishope at risk of further traumatization if contact with her mother continues." Cohen said that Bishope had threatened to kill herself to avoid returning to Miranda's custody. OCS later gave notice that it intended to call Cohen as an expert witness at the upcoming disposition hearing; Miranda unsuccessfully sought to preclude Cohen's testimony, arguing that OCS's notice was deficient.

Bishope continued running away from placements, and she twice reported having been sexually abused while on her own. Because of Bishope's high-risk behaviors when she ran away from less restrictive placements, and because she threatened to commit suicide if returned to Miranda, Bishope was admitted to a secure psychiatric hospital. Miranda participated in evaluations, programs, and case planning in compliance with her agreement with OCS.

**E.    Placement Hearings (June 2020 to March 2021)**

The parties sought various placements for Bishope.    A June 2020 opportunity at one facility fell through because, by the time OCS took the necessary action to finalize her acceptance, her running away from placements made her ineligible.    In August the court approved her placement at another facility, but that fell through due to a pandemic-related shutdown.

In October Bishope was moved to a short-term wilderness program in California.    The parties disagreed about her next placement.    In November, after OCS decided not to pursue one placement because of the program's disenrollment from Alaska Medicaid, Miranda filed a motion seeking specific performance of the earlier stipulated agreements.    OCS instead proposed sending Bishope to a treatment facility in Utah. Miranda responded with information about abuse at that facility.    Emails between OCS representatives and facility representatives later were characterized by the superior court as "shocking" and "simply unacceptable" evidence that OCS "tried to shoehorn" the facility to fit Dr. Levenson's recommendations.

In December the superior court determined that OCS had not abused its discretion by declining to place Bishope at the facility that was not Medicaid enrolled, but also determined that OCS had abused its discretion by pursuing her placement at the Utah facility.    Bishope then again was placed at an emergency foster home from which she previously had run away.    Miranda warned that Bishope would run away again, and the court ordered safety measures put in place.    Despite the installation of alarms, Bishope ran away, took a dangerous number of pills, was hospitalized, and then was admitted to a crisis recovery center.    Miranda identified another short-term wilderness program in Georgia; because the foster home placement was inadequate and this was the only other option open to Bishope, the court ordered OCS to make the placement.    Bishope arrived there at the end of December.

In February 2021 a spot became available for Bishope at the facility where she previously had been ineligible.    Miranda made an expedited motion to delay that

placement and to regain custody; she characterized her intent as preventing disruption, but the GAL and Bishope opposed it as a last-minute attempt to disrupt proceedings. The motion was denied, but due to delay in meeting enrollment requirements, Bishope was not placed at the facility until late March. She remained at that facility through the conclusion of the disposition hearing, making significant strides the court later called "quite promising."

### F. Disposition Hearing And Order

The superior court began the disposition hearing in October 2020. The hearing was interrupted by the various above-described placement hearings. The disposition hearing continued at later dates, with the court hearing testimony from witnesses including Dr. Levenson (in October 2020); Bishope's therapist, Cohen (in March 2021); another of Bishope's therapists, Emily Smith from the Georgia-based program (in March 2021); and Miranda (in June-July 2021). In August 2021 the superior court made its oral disposition order.

The court began by noting it was required to keep Bishope's health and safety as its primary concern while considering Bishope's best interests, OCS's ability to take custody of and care for Bishope, and the potential harm to Bishope that might be caused by removing her from Miranda's home and custody.[23] The court then pointed out various parties' unproductive conduct, observing that "some of the parties have treated each other or treated the problems in this case as standard, simple, or one-dimensional" when "nothing could be further from the truth." The court noted that parties had "vilified" Miranda and "treat[ed] [her] as the only or the main source of difficulties for Bishope," emphasizing that was "just not true." The court also noted that parties had inappropriately criticized Miranda's attorney, whom the court called "a strong advocate." The court acknowledged positive actions by Miranda and her

---

[23] *See* AS 47.10.082 (outlining required paramount concern and necessary considerations applicable to disposition hearing).

attorney, including advocating for better security at Bishope's placements, bringing to light problems with the proposed Utah placement, and notifying "the parties and the [c]ourt of failures in OCS's past handling of this case." The court said it nonetheless would make disposition findings consistent with what OCS and other parties had requested.

The court first found that Bishope continued to be a child in need of aid under AS 47.10.011(5) because of the risk of harm caused by her repeated running away and refusing care.[24] The court cited evidence and testimony from Cohen and the "quite thoroughly informed" opinion of Dr. Levenson demonstrating "that not just previously but even currently . . . if [Bishope] perceives [Miranda] as being in control of her care, she will reject that care and as a result, subject herself to grave — not just serious — grave physical and mental injury." Acknowledging concerns raised about how current Dr. Levenson's information was, the court found that this did not "tak[e] any great weight away from his opinion" and that his opinion and recommendations remained applicable. The court acknowledged Miranda's progress, pointing to her participation in agreed-upon treatments, but found she had not "conquered all of the difficulties or done all of the work . . . needed to address difficulties in herself." The court said that Miranda's testimony reflected a lack of acceptance or internalization of Bishope's viewpoint.

The court next found that it was contrary to Bishope's welfare to be returned to Miranda's home or care and that there was clear and convincing evidence, including expert witness testimony from Cohen and Dr. Levenson, that returning

---

[24] The court noted that there had been a previous stipulation that Bishope was a child in need of aid under this statutory provision, but the court made the finding "to the extent" it was required again at the disposition hearing. *Cf.* CINA Rule 15 (regarding hearing to adjudicate whether child is in need of aid).

Bishope to Miranda's custody was "highly likely to cause serious emotional or physical damage to [Bishope]."[25]  The court said that there was relevant testimony from multiple witnesses but that it found Dr. Levenson's opinion most compelling.  The court expressly referenced the evidence it had relied upon to find that returning Bishope to Miranda's custody was contrary to Bishope's welfare.

The court then found that OCS had made sufficiently active reunification efforts to support a disposition order.[26]  The court candidly listed OCS's prior failures, calling its efforts at times "complete chaos."  The court noted that OCS had entered into agreements it "either could not keep and should have known that ahead of time or just did not keep."  The court also pointed to OCS's miscommunicating information internally and externally, again expressing shock and dismay at OCS's attempts to manipulate the conversation about the Utah facility.  The court more generally expressed concern that OCS had been treating Bishope "almost generically . . . without really internalizing" her specific needs.  The court noted OCS's failures to protect Bishope "even when the risk of [running away] and harm that could result became quite clear over time."

Although unable "to pinpoint an exact date," the court nonetheless indicated active efforts began "fairly recently," noting that Dr. Levenson's work leading to Bishope's most recent residential in-patient placement was the turning point.  The court made clear that reunification of the family would require specific, effective

---

[25]     *See* CINA Rule 17(d)(2) (requiring, as predicate to disposition order including removal of Indian child from home, that court find "that continued placement in the home is contrary to the welfare of the child" and "that there is clear and convincing evidence, including the testimony of qualified expert witnesses, that custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child").

[26]     *See* CINA Rule 17(c)(2) (requiring, as predicate to disposition order regarding Indian child, that court find that OCS has made active family reunification efforts under 25 U.S.C. § 1912(d)).

treatment for Bishope and that treatment for Miranda's difficulties also was important. The court concluded that there had been a "shift" and that OCS had reached "the point of making active if not perfect efforts" to reunify Bishope and Miranda by securing Bishope's placement in the long-term residential treatment facility. The court noted the treatment facility's "strong parental component" might help Miranda progress as well and instructed OCS that more efforts should be directed to Miranda.

The court briefly addressed Bishope's placement.[27] The court noted that all parties agreed Bishope was "in the appropriate placement in the treatment setting" and that her continued placement would be evaluated at subsequent review hearings.[28]

The court, after making the required findings for a disposition order, maintained OCS's custody of Bishope for a two-year period.[29] A written disposition order — effective the day of the oral ruling — was entered the next month.

## G.     Appeal

Miranda appeals the superior court's disposition order. She contends that the superior court erred by not reviewing and vacating the initial provisional removal findings when they were violated; by not ordering specific performance for either stipulated agreement; by allowing OCS to call Cohen as an expert witness and relying on her testimony to reach its findings; by finding that OCS had made active efforts and that removal from the home was justified; and by making its final disposition decision with those stated deficiencies. OCS, the GAL, and Bishope filed responsive briefs supporting the superior court's decision.

---

[27]     *See* 25 U.S.C. § 1915 (setting out placement preferences for Indian children in CINA proceedings).

[28]     *See* AS 47.10.087(b) (requiring placement review every 90 days for child placed in secure residential psychiatric treatment facility).

[29]     *See* AS 47.10.080(c)(1) (authorizing OCS's custody of child in need of aid for up to 2 years not extending past the child reaching age 19).

## III. DISCUSSION

### A. We Decline To Address Miranda's Claim Of Error About Delaying Her Requested Review Hearing; Miranda's Claim Of Error About Enforcing Pre-Disposition Hearing Stipulations Has No Merit.

#### 1. Delayed review hearing

Miranda contends that the superior court erred in its November 2019 order delaying review of the "provisional removal findings" — that she and OCS initially had agreed to and that had been approved by the court — until the upcoming adjudication hearing. The parties disagree about how to frame the issue. Miranda emphasizes her parental rights, pointing out that a court's discretion to control its calendar is "subject to the constitutional rights of the litigants."[30] OCS, the GAL, and Bishope contend that the court may consolidate or combine phases of the CINA proceeding to promote judicial economy. They point out that courts generally control their calendars by consolidating issues[31] or combining various phases of CINA cases,[32] and they support

---

[30] *Judd v. Burns*, 397 P.3d 331, 339 (Alaska 2017) (quoting 75 AM. JUR. 2D *Trial* § 21 (2017)). We have recognized that parental rights are "one of the most basic of all civil liberties" and compared them to liberty interests at stake in civil commitments. *Jennifer L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 357 P.3d 110, 116-17 (Alaska 2015) (quoting *Seth D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1222, 1227-28 (Alaska 2008)).

[31] *See, e.g.*, Alaska R. Civ. P. 42(a) (permitting court to "order a joint hearing or trial of any or all the matters in issue in the actions" if they "involv[e] a common question of law or fact"). Rule 42(a) most obviously applies to consolidating separate cases, but we occasionally have referred to it when discussing a court's authority to consolidate stages of a CINA proceeding. *See, e.g.*, *Denise L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-15879, 2016 WL 11570753, at *11 (Alaska May 25, 2016); *see also Jeff A.C. v. State*, 117 P.3d 697, 709 n.5 (Alaska 2005) (Bryner, J., concurring).

[32] *See Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 264 P.3d 842, 847-48 (Alaska 2011) (holding court can make adjudication findings at end of probable cause hearing); Alaska CINA Rule 18(b) ("Upon a showing of good

the court's decision to combine review as promoting judicial economy. They also assert that the issue is moot because a hearing ultimately was held. Miranda in turn asserts that the public interest exception to mootness applies because the decision to delay review infringed on her constitutional right to parent Bishope.[33]

No realistic remedy is available were we to conclude that the hearing delay violated Miranda's due process rights; she did not ask for a remedy in her opening brief, but she posited at oral argument to us that, were we to find a due process violation, we should set aside everything that happened in the superior court after November 2019 and go back in time to her requested placement review. This is untenable in light of the superior court's efforts to move this case to a disposition hearing and its thoroughly detailed findings of fact and conclusions of law supplementing its disposition order. The issue clearly is moot.

Miranda's reliance on the public interest exception to mootness is unpersuasive. First, her alleged due process violation, arising from the two-month delay between the late November 2019 order and beginning of the late January 2020 adjudication hearing, is *de minimis* on the facts of this case, especially when her due process rights were protected throughout a variety of placement hearings and the ultimate disposition hearing. Second, the alleged due process violation arises from a

---

cause and with adequate notice to the parties, an adjudication hearing and a termination hearing may be consolidated.").

[33] "A claim is moot if it has lost its character as a present, live controversy." *Jennifer L.*, 357 P.3d at 114 (quoting *Peter A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 146 P.3d 991, 994 (2006)). We may exercise discretion to hear a moot appeal under the public interest exception to the mootness doctrine after considering: "(1) whether the disputed issues are capable of repetition; (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented; and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine." *Id.*

superior court's discretionary decision to combine stages of this particular CINA proceeding, which necessarily is based on the specific facts of this case and Bishope's best interests;[34] ruling on the facts of this case would lend little guidance to future cases. We thus decline to reach this issue.

### 2. Stipulations

Miranda contends the superior court erred by failing to enforce the two stipulated agreements that she and OCS had reached but were not effectuated. She argues that the stipulations were binding and that the court should have ordered specific performance when OCS ceased honoring them. (We note that the first stipulation was approved by the court, but the second stipulation was not.[35]) Bishope contends that the issue is moot because OCS subsequently placed her at a facility as contemplated by the agreements, and no party asserted that Bishope should be moved to a different facility. The GAL and Bishope emphasize that parties cannot be bound by a contract for a placement that ultimately is subject to judicial review.

We reiterate that the fundamental basis for CINA proceedings is the child's best interests.[36] CINA proceedings are not static; there always are ebbs and flows of actions, inactions, status changes, superseding events, and other matters affecting the child's best interests. A stipulation entered one day may not be in the child's best interests six months later. In this case the parties had numerous hearings on a variety of matters involving Bishope's best interests; agreements by some, but not all, of the parties attempted to control her placement for some periods of time; and, in the face of ultimate disagreements about her placement and best interests, the court

---

[34]     *See* AS 47.10.005(1) (providing statutory requirements are to be liberally construed to ensure child in need of aid shall "receive the care, guidance, treatment, and control that will promote the child's welfare and the parents' participation . . . to the fullest extent consistent with the child's best interests").

[35]     *Cf.* CINA Rule 14(a)-(b) (regarding court approval of stipulations).

[36]     *See* AS 47.10.005(1).

conducted the disposition hearing and rendered its decision. The disposition decision superseded any inconsistent agreements; we will not vacate a disposition decision and enforce stale agreements inconsistent with the child's best interests. We therefore reject Miranda's claim of error and her request that, based on this point alone, we vacate the disposition order.

Perhaps recognizing that we would not grant substantive relief even if we determined Miranda's due process rights had been violated, Miranda focuses on imposing sanctions against OCS. She points out that she asked the superior court to consider sanctions but that the court did not address sanctions in its disposition order. She requests that we therefore remand to the superior court to consider imposing sanctions on OCS.

Miranda's closing comments about sanctions against OCS were as follows:

> The court may wish to consider sanctioning [OCS]. Appropriate sanctions could include an order that [OCS] correct the false statements that it has made to any external agency about [Miranda, Bishope], or this court, in writing, subject to the approval of the court. The court could also consider monetary sanctions and invite further briefing about the appropriateness of monetary sanctions.

We assume the superior court read Miranda's closing arguments and that the omission of this issue from the oral and written orders was a decision to forego sanctions. Sanctions are a discretionary decision subject to deferential appellate review.[37] In light of the superior court's dedicated efforts to get consensus among the parties with respect to Bishope's treatment and improved collaboration for her benefit — or at least less divisiveness on either personal or professional levels — we see no abuse of discretion

---

[37] *See Enders v. Parker*, 125 P.3d 1027, 1037 (Alaska 2005) (emphasizing that a trial court's decision to impose or not impose sanctions is "subject to review only for abuse of discretion").

by declining to impose sanctions on OCS, and we see no reason for a remand for the superior court to explain its decision.

**B.     The Superior Court Did Not Err By Admitting And Considering Therapist Cohen's Testimony.[38]**

Miranda asserts that the superior court erred by allowing OCS to call Bishope's former therapist, Cohen, as an expert witness.[39]  Miranda does not challenge Cohen's qualifications as an expert; Miranda primarily argues that the court failed to make the necessary predicate determination regarding the admissibility of Cohen's testimony under Alaska Evidence Rules 703[40] and 705(b).[41]  Just before Cohen's trial testimony, Miranda objected to allowing Cohen to testify without a determination that the information she relied upon was commonly used by experts in her field.  Miranda argued that because Cohen recently had seen reports from Dr. Levenson and another expert and because notice had been given that neither report changed Cohen's opinions,

---

[38]     *See Cora G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 461 P.3d 1265, 1277 (Alaska 2020) (noting that it is generally "left to the trial court's discretion whether expert testimony is appropriate in a given case, and if so, whether a proposed expert witness is qualified to testify on a particular issue").

[39]     *See* Alaska R. Evid. 702(a) ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.").

[40]     *See* Alaska R. Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  Facts or data need not be admissible in evidence, but must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.").

[41]     *See* Alaska R. Evid. 705(b) ("An adverse party may request a determination of whether the requirements of Rule 703 are satisfied before an expert offers an opinion or discloses facts or data.").  Failure to make a Rule 705(b) determination is harmless error if the "reasonable reliance" test is met.  *See Norris v. Gatts*, 738 P.2d 344, 350 (Alaska 1987).

a foundation would have to be laid to demonstrate that an expert in Cohen's position would not have considered and relied on those reports when providing expert testimony. The superior court overruled the objection.

Cohen was qualified to testify generally on matters of clinical psychology, complex trauma, and parent/child attachment. Cohen clearly was both a fact and expert witness in light of her prior treatment of Bishope;[42] her testimony thus was mostly fact-based and drawn from her prior personal experiences with Bishope and Miranda. But because Cohen had not recently treated Bishope, Cohen could not testify to Bishope's *current* state of mind regarding Miranda's custody and care, and Cohen seems to have carefully avoided doing so. For example, after Cohen's testimony about her work with Bishope and why Cohen had written her September 2020 letter expressing her concerns about Miranda and Bishope's relationship, Cohen specifically stated that although she could not "speak to today, back then [the relationship] had gotten pretty hot, particularly [Bishope's] feelings toward her mother."

Miranda now contends that Cohen's testimony failed to meet the "reasonable reliance" test because it failed to account for the six-month period in which Cohen was not updated about Bishope's status, given updated reports, or informed about Miranda's progress. But Cohen did not need to consider that information to testify about her past treatment of Bishope and the opinions she had reached based on that treatment. Had Cohen expressed opinions about Bishope's *current* state of mind or the *current* relationship between Bishope and Miranda based on past work with Bishope, Cohen's lack of current knowledge might well have fueled cross-examination about her lack of current knowledge. But Miranda makes no argument that Cohen's

---

[42] We have recognized that "the distinction between an expert witness and a fact witness inevitably becomes blurred" and that treating physicians may testify both to "expert observations" and to "opinions regarding their patients' injuries, treatment, and prognoses." *Miller ex rel. Miller v. Phillips*, 959 P.2d 1247, 1250 (Alaska 1998).

actual opinions about Bishope's past state of mind and past relationship with Miranda — based on Cohen's professional experience and work with both Bishope and Miranda — were not based on information a treating therapist usually would rely on for those opinions.

Dr. Levenson, whom Miranda calls "far more qualified" and whose opinion the superior court relied on "in particular," reached the same conclusions as Cohen based on more current information. The court thus heard more than adequate testimony to support its finding "that *not just previously but even currently . . .* if [Bishope] perceives [Miranda] as being in control of her care, she will reject that care and as a result, subject herself to grave — not just serious — grave physical and mental injury." (Emphasis added.) The court's specific reference to Bishope's previous state of mind reflects that it considered and relied on Cohen's testimony for that purpose and relied on Dr. Levenson's testimony for a more current view of Bishope's state of mind. We see no abuse of discretion in the superior court's decision allowing Cohen to testify.

### C. We Affirm The Superior Court's Disposition Order.

#### 1. Active efforts

ICWA defines active reunification efforts as "affirmative, active, thorough, and timely."[43] We have emphasized that there is "no pat formula" for determining active efforts,[44] and we repeatedly have held that the determination is made

---

[43] 25 C.F.R. § 23.2 (2016). One hallmark of active efforts has been whether OCS "takes the client through the steps of the plan rather than requiring that the plan be performed on its own." *Bill S. v. State, Dep't of Health & Human Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 982 (Alaska 2019) (quoting *N.A. v. State, Div. of Fam. & Youth Servs.*, 19 P.3d 597, 602-03 (Alaska 2001)).

[44] *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 561 (Alaska 2022) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013)).

in light of OCS's involvement "in its entirety."[45] OCS's efforts do not need to be perfect.[46] If OCS's involvement is inconsistent, courts may consider "whether . . . the period when active efforts were made compensated for the time during which they were not."[47] We have rejected an active-efforts finding after OCS's "extreme" failure to make adequate efforts for "fully half" of its involvement with a case,[48] although we also have cautioned against any suggestion that this is a bright-line rule.[49]

We note that the cases referred to above focused on whether there was clear and convincing evidence of OCS's active efforts to support a termination of parental rights after a trial, not on whether an active efforts finding can be made to support an early stage disposition order.[50] And it is important that if active efforts

---

**45** *See, e.g.*, *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1269 (Alaska 2008); *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 766 (Alaska 2009).

**46** *Christopher C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 303 P.3d 465, 478 (Alaska 2013).

**47** *See, e.g.*, *Jacoby C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-18147, 2022 WL 1162514, at *5 (Alaska Apr. 20, 2022) (summarizing cases).

**48** *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 904 (Alaska 2021).

**49** *See Jacoby C.*, 2022 WL 1162514, at *5.

**50** *Compare* CINA Rule 18(c) (requiring, for parental rights termination, clear and convincing evidence that OCS complied with AS 47.10.086(a)'s reasonable efforts standard and, in case involving Indian child, with ICWA's active efforts standard (in 25 U.S.C. § 1912(d))), *with* CINA Rule 17(c) (requiring, for disposition order when child has been placed outside child's home, finding (without stated burden of proof on factual determinations) that OCS complied with AS 47.10.086(a)'s reasonable efforts standard and, in case involving Indian child, with ICWA's active efforts standard (in 25 U.S.C. § 1912(d))). The superior court did not mention "clear and convincing evidence" in either its oral or written active efforts finding, the parties did not address this distinction in their briefing, and we assume without deciding that the predicate

cannot be found at the disposition stage, the existing temporary custody arrangement should continue until OCS's further reunification efforts are sufficient to be "active."[51]

In its oral ruling the superior court discussed OCS's efforts at some length, stating the court's view that OCS's efforts had evolved as a result of the various placement review hearings over the course of the proceedings. The court found that OCS was making (unsuccessful) active efforts "at this time" but acknowledged that it had started only "fairly recently." The court would not pinpoint a specific date. Clearly recognizing the distinction between active efforts to be proved at a disposition hearing and at a termination hearing, the court stated that specifically pinpointing the inception of active efforts might "need to be litigated further in the future." The court's oral ruling and later written order approximated the start of active efforts with Bishope's March 2021 placement in a residential treatment facility.

Bishope supports the court's disposition order, emphasizing the "unique" context of a relatively older minor who "has been clear and consistent" about not wanting to engage with a parent. Bishope contends that OCS correctly focused on finding an appropriate placement as a means to promote later reunification. We agree with Bishope. It seems evident from the expert witnesses' reports and testimony that perhaps the most critical element preventing reunification of the family is the toxic relationship between Bishope and Miranda. Dr. Levenson may have expressed it best in his report, stating that it was unlikely OCS could reunify the family in the near future.

---

active efforts finding for a disposition order must be proved by a preponderance of the evidence and is reviewed for clear error and consistency with the law. *See, e.g.*, *Maisy W.*, 175 P.3d at 1267 ("Whether [OCS] complied with the "active efforts" requirement . . . is a mixed question of law and fact.").

[51] *See* CINA Rue 17(c) (providing that, if court cannot make active efforts finding at disposition hearing, disposition order must be postponed and child should remain in temporary custody).

And no party seems to dispute that Bishope's primary avenue to recovery and possible eventual reunification with Miranda is long-term specialty residential treatment.

We therefore conclude that the superior court did not err by finding, on the record before it and based on a preponderance of the evidence standard, that OCS had made active, albeit unsuccessful, efforts sufficient to support the disposition order.

### 2. Removal findings

CINA Rule 17(d)(2) sets out the required removal findings for a disposition order:

> The court may approve the removal of the child from the child's home only if the court finds that continued placement in the home is contrary to the welfare of the child; and, in cases involving an Indian child, that there is clear and convincing evidence, including the testimony of qualified expert witnesses, that custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

Miranda asserts that the superior court erred by making the required removal findings and "by not ordering Bishope released to Miranda . . . and dispensing with [OCS's] supervision." Miranda points to positive testimony about her and emphasizes that she would not disrupt Bishope's current treatment plan. Miranda argues that "home" really means only "custody" and that the court did not need to find Bishope could return safely to Miranda's literal home rather than to her custody; Miranda concludes that custody of and decision-making authority for Bishope should have been returned to her. Miranda's arguments are unpersuasive and seem to support the superior court's finding that Miranda has not internalized or accepted Bishope's absolute rejection of Miranda's custody or control.

Not only is it evident from the expert witnesses' reports and testimony that at the time of the hearing an insurmountably toxic relationship between Bishope and Miranda precluded Bishope's return to Miranda's actual home, it is equally evident that even knowing Miranda was controlling Bishope's treatment would negatively impact

Bishope. And the superior court made that express finding: Based largely on Dr. Levenson's testimony, the court concluded that Bishope would react negatively to any treatment plan — and thus endanger herself — if she perceived it originating from Miranda.[52]

We conclude that the superior court did not clearly err by finding, on the record before it and on a clear and convincing evidence standard, that granting custody to Miranda would likely cause Bishope serious emotional damage.

### 3. Disposition

Having determined that the superior court's predicate findings for the disposition were not clearly erroneous, we conclude that the superior court did not abuse its discretion by entering the disposition order.

## IV. CONCLUSION

We AFFIRM the superior court's disposition order.

---

[52] Miranda contends that Cohen's testimony was not admissible to support the removal findings because Cohen could not state whether there currently was "a 'causal connection' between 'conditions in the home' and a 'specific threat to the child's well-being.'" Although that certainly is the relevant issue, the required expert opinion need only support the final determination. *See Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Child.'s Servs.*, 336 P.3d 1258, 1270 (Alaska 2014) (stating that whether expert testimony satisfies IWCA requirements is question of law and that specified harm to child can be established through testimony of single witness, by aggregating multiple expert witnesses' testimony, or by aggregating expert witness testimony with lay testimony). We reject Miranda's challenge to the court's reliance on Cohen's testimony.

CARNEY, Justice, dissenting in part.

I agree with most of the court's decision today. But I do not agree that OCS's eleventh-hour capitulation to the superior court's finding that it failed to make active efforts when it refused to comply with its own expert's treatment recommendation merits a finding that it did, in fact, make active efforts. I recognize that after it was forced to place Bishope in appropriate treatment OCS improved its efforts to meet ICWA's exacting requirement. But I would reverse the superior court's determination that it made active efforts.

I acknowledge that this is an unusual and difficult case. I recognize both Bishope's extraordinary needs and the superior court's careful analysis of the facts and applicable law. But the superior court's own findings belie its ultimate conclusion. As a result, I fail to understand either its finding of active efforts or today's affirmation of it. In light of this court's observation "that if active efforts cannot be found at the disposition stage, the existing temporary custody should continue until OCS's further reunification efforts are sufficient to be 'active',"[1] I also fail to understand this court's reluctance to hold OCS to the "gold standard" required by federal law.[2]

Bishope first came into OCS custody after the agency filed a petition for custody in July 2019. Her extraordinary needs were apparent at the time although they worsened while she was in custody — due in part to OCS's actions. The court found that "during the great expanse of this case, [Bishope] was not making progress. To the contrary, [Bishope], until recently, has been harmed. She has suffered harm and further

---

[1]    Opinion at 25-26.

[2]    *See* Brief of Casey Family Programs, et al. as Amici Curiae Supporting Respondent, at 4, Adoptive Couple v. Baby Girl, et al., 570 U.S. 637 (2013) (No. 12-399) ("ICWA's statutory requirement that active efforts be made . . . reflects the gold standard for child welfare practices that should be aspired to for all children.").

trauma during the course of this case. . . . That is one failure that has taken place during this case."

The court made detailed findings exploring all of OCS's actions toward Bishope and Miranda. At disposition the court first found that "at this time, OCS is making reasonable efforts" and then that "at this time, OCS is making active efforts" to reunify the family. The court admitted it was "not able to pinpoint an exact date" when OCS began to make the required efforts. And it announced that it did "find that OCS was not making active efforts until fairly recently," when Bishope was finally moved to the "effective" treatment program where she remained during the hearing. The court observed that OCS's efforts to get Bishope into appropriate treatment "have come to be active."

The court emphasized that reunification and Bishope's wellness "absolutely rely on effective treatment for [Bishope's] mental health, addressing specifically the difficulties that [she] is experiencing . . . not generic . . . but very specific, specifically recommended treatment." The court pointed out that OCS had "specifically agreed to" such treatment for Bishope, and lamented that "there has been, despite those agreements, great difficulty and litigation over reaching" this result. But the court identified the "point in time where [OCS] . . . was forced to shift focus in terms of securing appropriate treatment" as the point at which active efforts began to be made. It emphasized that "[t]hey are not perfect efforts still, and I'll talk about that, but that's the point at which the Court finds that active efforts have been and/or are being made."

As it proceeded to "talk about that" the court "want[ed] to be very clear . . . that the amount of hours or doing lots of things in itself does not amount to active efforts, particularly when things are being done at cross purposes with the goal that's been stated." The court decried that "[f]rankly . . . at times it has felt like those efforts are in complete chaos . . . . And so, the amount of time and the amount of things done do not equate to active efforts." The court also itemized some of the efforts that did not count as active. It first referred to OCS's reneging on both of the agreements it

had signed with Miranda. It pointed to OCS's "communicating . . . important incorrect information . . . either internally or to others, including to potential mental health treatment providers for [Bishope]." The court found that "[t]he evidence does demonstrate that . . . in spite of receiving a very important opinion and recommendation [from Dr. Levenson] . . . [OCS] has at times treated [Bishope] almost generically . . . without any eye for what specifically [Bishope] needs in treatment."

The court laid out "shocking" evidence of OCS's attempt to manipulate information about proposed treatment. It noted "evidence that demonstrates pretty clearly that [OCS] tried to shoehorn their chosen treatment program at one point to somehow fit the recommendations of Dr. Levenson," and in particular, "emails from folks at pretty high levels in OCS asking [the Utah facility] if they're able to say that they are specialized or specialize in reactive attachment disorder [when they are not and do not]." The court concluded that OCS had worked to "shoehorn particular programs that were . . . more affordable or . . . easier to get [Bishope] into" instead of working to get her the treatment Dr. Levenson recommended — and to which they had already agreed.

The court continued to identify OCS's specific failures. OCS failed to "look toward protecting [Bishope]" even when it became clear that she would continue to run away from foster homes and after she repeatedly endangered herself while on the run. The court found that "[t]here has been a failure previously by [OCS] to think prospectively ahead of time . . . about transitioning [Bishope] to appropriate care . . . and fail[ure] to provide for transition to appropriate long-term care." The court underlined that "even after this issue had become . . . quite clear to the parties . . . and then even fairly recently, in terms of looking toward transition from [a short-term program to a more effective program] there is evidence of communication from [OCS to the short-term program] that suggests that perhaps [Bishope] could just be there for another full round [of short-term treatment]." That "suggestion or inquiry . . . seems to

treat that as an appropriate alternative or an acceptable alternative, which it is not obviously."

"All of that said," the court "believe[d] that the placement hearings that we have had . . . have brought [OCS] to the point of making active if not perfect efforts. And, again, that shift, I find, is really where [OCS] finally secured and worked to have [Bishope] placed with an effective mental health provider that could treat the complex issues that [she] is currently struggling with."

Turning to OCS's efforts toward Miranda, the court warned OCS that it "would expect very much a change in tone and approach toward [her]." It stated that "there needs to be a recognition of the validity of many of [Miranda's] grievances and difficulties with [OCS]." But as it had with respect to OCS's belated efforts toward Bishope, the court found that OCS's efforts, while "not perfect" were "currently active."

In other words, after specifically finding not only that OCS had not made active efforts through much of the case, the court made multiple findings that OCS's efforts not only were not active, but were actually counterproductive. The court found that OCS had caused harm to Bishope; worked at "cross purposes" to her needs; tried to convince treatment facilities to misrepresent their services to the court; attempted to place her in "generic" treatment despite her extraordinary and documented needs; and failed to work with Miranda. The court found that OCS eventually began to make efforts that could be considered "active," but it also found that this only occurred after OCS was "forced" to take appropriate action by repeated placement review hearings that Miranda requested — hearings at which the court explicitly warned OCS that its efforts were not yet active.

Even recognizing OCS's lesser burden at the disposition stage to demonstrate active efforts, I cannot agree to affirm the superior court's finding. OCS's coerced and belated attempt to satisfy the active efforts requirement it has been under since its decision to seek custody of Bishope fails to meet the statutory standard when

I consider the superior court's detailed findings.  I would reverse the superior court's finding that it does.  I respectfully dissent.