NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TIFFANY B., | ) | |
| | ) | Supreme Court No. S-18990 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-17-00139 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF FAMILY & COMMUNITY | ) | |
| SERVICES, OFFICE OF | ) | No. 2062 – December 4, 2024 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances: Megan R. Webb, Assistant Public Defender, and Terrence Haas, Public Defender, Anchorage, for Appellant. Laura Wolff, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I. INTRODUCTION

A mother is before us a second time, appealing the superior court's termination of her parental rights. The mother's previous appeal regarded a prior

---

\* Entered under Alaska Appellate Rule 214.

termination order. We reversed that order, concluding that the Office of Children's Services (OCS) had failed to provide active efforts to reunify the family. Following remand, OCS worked with the mother for another 16 months, but the superior court ultimately terminated the mother's rights once again. The mother appeals, arguing that the court erred in determining that OCS had made active efforts and by failing to analyze the testimony of a cultural expert regarding risk of harm to the child if returned to the mother's home. Seeing no error, we affirm the termination of parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    Initial OCS Efforts, First Termination Of Parental Rights, And Appeal

#### 1.    Initial protective order and emergency removal

In November 2015 Tiffany B. gave birth to Andi B.[1] Andi is an Indian child as defined by the Indian Child Welfare Act (ICWA).[2] Andi has learning disabilities and is on the autism spectrum. Tiffany has been diagnosed with borderline personality disorder, fetal alcohol spectrum disorder, reactive attachment disorder, and post-traumatic stress disorder.

Tiffany struggled with threats of self-harm before Andi was born, and also threatened to harm Andi during the first year of Andi's life.[3] Tiffany and Andi lived with Tiffany's parents, Ginny and Ray B., who primarily cared for Andi.[4] In March

---

[1]    We use pseudonyms for all family members. Andi's father voluntarily relinquished his parental rights before the first termination trial. *Tiffany B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-18111, 2022 WL 2066045, at *1 (Alaska June 8, 2022).

[2]    *See* 25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

[3]    *Tiffany B.*, 2022 WL 2066045, at *1.

[4]    *Id.*

2017 Ginny and Ray obtained a one-year protective order on behalf of Andi against Tiffany, and Ginny and Ray were granted temporary custody.[5] A year later OCS filed an emergency petition for temporary custody of Andi. The superior court granted the petition, and OCS placed Andi with Ginny.[6]

### 2. OCS interactions with Tiffany and first termination order

From March to September 2017, OCS facilitated visitation between Tiffany and Andi, assisted Tiffany with transportation needs, and arranged services for Andi.[7] It also developed one case plan that Tiffany did not sign.[8] The plan stated OCS would refer Tiffany for a neuropsychological evaluation, but she did not sign a release of information (ROI) and OCS did not follow up about the ROI after Tiffany missed two meetings.[9] Evidence at a subsequent termination trial reflected little additional information about OCS's efforts between October 2017 and September 2019.[10]

From October 2019 through July 2020, OCS's efforts improved somewhat.[11] An OCS caseworker created a new case plan, but OCS provided little support to help Tiffany accomplish the goals in the case plan.[12] Tiffany signed an ROI allowing OCS to discuss her case with her therapist.[13] OCS also referred Tiffany to drug testing, but she missed three of those appointments, and tested positive for substances in her other ten. She was eventually banned from the testing center because

---

[5]     Id.

[6]     Id.

[7]     Id. at *2, *6.

[8]     Id. at *2.

[9]     Id. at *6.

[10]    Id.

[11]    Id. at *7.

[12]    Id.

[13]    Id.

of an outburst there.[14]  Additionally, Tiffany became more distrustful and antagonistic towards her caseworker, requesting to only meet by phone and then only communicating with her caseworker via text message.[15]  A new caseworker subsequently took over and provided a new case plan, but the plan failed to identify next steps for OCS to support Tiffany in reaching the case plan goals.[16]

The court held a termination trial,[17] and in June 2021, it issued an order terminating Tiffany's parental rights.

### 3.    2022 appeal and decision

Tiffany appealed, challenging the superior court's active efforts findings among other issues.[18]  During the pendency of the appeal, the court granted a decree of adoption for Ray and Ginny to adopt Andi.

In June 2022 we reversed the termination order and concluded OCS failed to provide active efforts.[19]  We decided that the case "include[d] long stretches of time for which there [was] no evidence of OCS efforts, some instances of laudable efforts, and some periods when OCS recommended programs but otherwise left Tiffany largely to her own devices — the definition of passive efforts that fail to meet ICWA's exacting standard."[20]  We remanded the case for further proceedings.[21]

---

[14]     *Id.* at *3.

[15]     *Id.* at *2, *7.

[16]     *Id.* at *7.

[17]     *Id.* at *4.

[18]     *Id.*

[19]     *Id.* at *4-10.

[20]     *Id.* at *8.

[21]     *Id.* at *10.

### B. OCS Efforts After Remand And Second Termination Of Parental Rights

#### 1. June to December 2022 OCS interactions

After we reversed the termination order, the superior court vacated its adoption order and granted OCS custody of Andi while maintaining placement with Ray and Ginny. OCS assigned a new caseworker to Tiffany's case. That summer the caseworker met with all of the parties, including Andi's Tribe, the guardian ad litem (GAL), and Ginny, Ray, and Andi, to understand what the main issues in the case were. The caseworker had two calls with Tiffany, during which they discussed case planning and Tiffany's work with a prior therapist. The caseworker also referred Tiffany to drug testing. At Tiffany's request, the caseworker called Tiffany's previous therapist multiple times and left voicemails, but he could not reach her. The therapist later called the Tribe's ICWA representative and explained that she was not a good fit to continue working with Tiffany and recommended a different therapist.

During the fall of 2022, Tiffany saw Andi frequently through meetings with her and Ginny. Tiffany also attended two appointments for Andi. Later in the fall the caseworker referred Tiffany to a provider for supervised visitation. However, the provider declined to supervise visitation due to Tiffany's history of violence.

That October the caseworker created Tiffany's first post-remand case plan and discussed the case plan with Tiffany by phone. The case plan called for Tiffany to learn to regulate her emotions, better understand Andi's needs, and address her substance abuse. The case plan itself contained many blank spaces and listed just two service providers with no associated contact information for either.[22]

---

[22] The caseworker explained that some parts of the case plan were not completed because they did not have enough time in the initial call to fill in all of the information. The caseworker also indicated that he lacked ROIs or contact information for Tiffany's preferred providers. The caseworker gathered this information in later phone calls, but this information was not documented in the case plan.

In November the Tribe's ICWA representative emailed the caseworker asking him to enhance the activities in Tiffany's case plan and to provide Tiffany with a written calendar of Andi's events. The caseworker agreed. Later in November Ginny reported that while she was driving with Tiffany and Andi, Tiffany punched Ginny in the face, grabbed the steering wheel, and put the car in neutral. Ginny was able to get the situation back under control, but Andi was scared and upset by the incident. During that month and the following month, the caseworker continued to send Tiffany texts and emails scheduling calls and meetings, but Tiffany seldom responded and she refused to attend three scheduled meetings. The caseworker also continued to request that Tiffany complete a drug test, but Tiffany refused.

**2.      January to September 2023 OCS interactions**

In January 2023 the caseworker met with Tiffany to discuss Tiffany's case plan and to obtain a signed ROI so he could refer her for a neuropsychological evaluation. Tiffany sent a blank ROI back to the caseworker. The caseworker responded by filling in parts of the ROI he could complete and highlighted what she needed to fill in, but Tiffany never sent the caseworker a completed ROI.

Toward the end of the month the court held a permanency hearing in which the Tribe requested four action items from OCS that it believed would establish active efforts: (1) referring Tiffany to a provider for supervised visits, (2) identifying an appropriate counselor for Tiffany, (3) having Tiffany sign ROIs so OCS could access a more recent psychological evaluation, and (4) working with Tiffany to understand Andi's diagnoses and needs. The court granted OCS's request for a continuance so that OCS, Tiffany, and the Tribe could work on these and related efforts.

Shortly thereafter Ginny sent the caseworker audio recordings of Tiffany making threats against Ginny, Ray, Andi, and the caseworker. OCS decided there could be no family contact with Tiffany outside of OCS's offices due to Tiffany's threats, but Tiffany declined to have family visits there.

From February through May 2023, Tiffany largely did not respond to the caseworker's texts or emails and missed a scheduled meeting. The caseworker nonetheless continued to refer Tiffany for drug testing, and talked to a supervisor at the drug testing center to ensure Tiffany would be allowed to test there despite previously being banned. Tiffany did not attend drug testing. During this period, the caseworker updated Tiffany's case plan, and completed a case plan evaluation, observing that Tiffany had made no progress toward any of her goals. In May OCS petitioned for termination of Tiffany's parental rights.

In July and August, Tiffany met with her caseworker twice, apologized for her threats, and agreed to call a provider for mental health services, but she refused to sign the involved ROI and refused to do any drug testing. Thereafter, she missed several meetings despite the fact that the caseworker called cabs for her and was willing to meet at her requested location.

### 3. Second termination trial and termination order

The court held a two-day termination trial in October 2023. Four witnesses testified on behalf of OCS: Ginny, the caseworker, an expert witness who was a licensed clinical social worker, and a cultural expert witness. The court considered the evidence from the prior termination trial without objection from the parties, though Tiffany maintained the objections she made at the prior hearing.

Ginny testified about Tiffany's concerning behaviors related to Andi, explaining Tiffany had recently made violent threats towards her family and had a history of violence towards her family and domestic partners.

The clinical social worker analyzed OCS's efforts and recommended termination of Tiffany's parental rights. She testified that the caseworker attempted to overcome barriers with Tiffany and used a trauma-informed approach. The social worker said ultimately there was nothing that OCS "could have done differently in this situation." The social worker testified that in light of Tiffany's emotional volatility and violence, she posed a serious risk of physical or emotional harm to Andi if Andi were

returned to her care. A separate cultural expert agreed with this assessment, observing that the analysis did not misunderstand or fail to appreciate any relevant cultural standard or practice.

In January 2024 the superior court once again terminated Tiffany's parental rights to Andi. It found Andi was a child in need of aid due to Tiffany having placed her at substantial risk of physical and mental harm[23] and due to the substantial risk of harm associated with Tiffany's mental illness.[24] The court further found that Tiffany had not remedied the conduct causing Andi to be a child in need of aid and determined that if Andi were returned to Tiffany's care, Andi would likely suffer substantial harm. The court considered evidence of OCS's efforts offered at the first trial, as well as evidence of OCS's efforts following remand, and concluded that OCS had made active efforts to reunite the family. And the court concluded it was in Andi's best interests to terminate Tiffany's parental rights.

Tiffany appeals, arguing first that the court's active efforts analysis was legally deficient and second that the court erred in failing to make specific findings regarding the cultural expert's testimony.

## III. STANDARD OF REVIEW

Whether OCS provided active efforts under ICWA and whether the court's conclusion that a child likely would be seriously harmed if returned to a parent are mixed questions of law and fact.[25] "We review the superior court's findings of fact

---

[23]    *See* AS 47.10.011(6).

[24]    *See* AS 47.10.011(11).

[25]    *See Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 981 (Alaska 2019); *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1008 (Alaska 2022).

for clear error, but 'we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA.' "[26]

## IV. DISCUSSION

### A. The Court Properly Analyzed OCS's Efforts As A Whole And Did Not Err In Determining That OCS Made Active Efforts.

Under ICWA, when OCS seeks to "terminat[e] parental rights to[] an Indian child . . . [OCS] shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[27] "[A]ctive efforts will be found when OCS 'takes the client through the steps of [a case] plan rather than requiring that the plan be performed on its own,' but not when 'the client must develop his or her own resources towards bringing [the plan] to fruition.' "[28] Courts evaluate the record as a whole in determining if OCS provided active efforts.[29]

A parent's lack of cooperation with OCS can impact a court's active efforts analysis in three ways: "(1) it can excuse further active efforts once it is clear those efforts would be futile; (2) it can excuse 'minor failures by [OCS]'; and (3) it can influence what actions qualify as active efforts."[30] Nevertheless, "[a] parent's lack of

---

[26] *Bill S.*, 436 P.3d at 981 (quoting *Caitlyn E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 399 P.3d 646, 654 (Alaska 2017)).

[27] 25 U.S.C. § 1912(d); *see* CINA Rule 18(c)(2)(B).

[28] *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013) (first quoting *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 602–03 (Alaska 2001); and then quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1114 (Alaska 2010)).

[29] *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1268 (Alaska 2008).

[30] *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 562-63 (Alaska 2022) (first citing *Wilson W. v. State, Off. of Child.'s Servs.*, 185 P.3d 94, 97, 101 (Alaska 2008); then citing *Ben M. v. State, Dep't of Health*

cooperation or unwillingness to participate in treatment does not excuse OCS from making active efforts and proving that it has made them."[31]

Here Tiffany does not dispute that OCS made active efforts toward reuniting the family following our reversal of the superior court's first termination order and the resulting remand. Rather, she argues that the superior court did not adequately consider the entirety of OCS's efforts, including the "impact the first four years of passive efforts had on the subsequent sixteen months of active efforts." She claims that this is especially significant because Tiffany's early interactions with OCS and the first termination of her parental rights impacted her mental health and her ability to trust and work with OCS following the remand. Tiffany also asserts that the court overemphasized her "lack of cooperation" in examining the record underlying the first termination trial rather than considering the passive nature of OCS's attempts to work with her at that time.

We are not persuaded by Tiffany's arguments. First, we observe that the superior court properly considered OCS's efforts in their entirety when it issued its second termination order. The court described OCS's efforts before the first termination trial and discussed our prior ruling on active efforts. With that history in mind, it then made findings regarding OCS's post-remand efforts to work with Tiffany. It is true that the court spent greater time detailing and analyzing OCS's post-remand efforts, but that is not unexpected, given that OCS's pre-remand efforts had previously been litigated and analyzed by the superior court and by us on appeal. The court was understandably more expansive in making findings related to the evidence newly before it. Although the court's discussion of OCS's post-remand efforts was lengthier than its

---

& Soc. Servs., Off. of Child.'s Servs., 204 P.3d 1013, 1021 (Alaska 2009); and then citing Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs., 343 P.3d 425, 432-33 (Alaska 2015)).

[31]     Id. at 562 (citing Bill S., 436 P.3d at 983).

references to the pre-remand efforts and related litigation, the court was quite clear that it considered OCS's efforts, pre- and post-remand, "in their entirety," and determined that those efforts, when considered as a whole, were active.[32]

Moreover, the superior court did not err in determining that OCS's efforts, considered in their entirety, were active. We acknowledge that given the sporadic nature of OCS's efforts prior to the court's first termination order, achieving active efforts overall would require extensive work by OCS with Tiffany over a significant period. But that is what OCS provided here. Indeed, Tiffany acknowledges that following remand, OCS provided active efforts to reunite the family for a period of 16 months. This included extensive efforts by the caseworker to communicate with Tiffany in a trauma-informed way. The caseworker explained at trial that working with parents in this way requires persistence and "a high degree of empathy and understanding for . . . why a parent might be resisting efforts to move forward." He testified about the importance of doing everything possible to understand the things that have led a parent to a particular situation and then trying to provide services that will meet that parent's corresponding needs.

Along those lines, the caseworker reached out to Tiffany regularly, and he expressed willingness to meet with Tiffany in whatever way worked for her, whether that was at Ginny and Ray's house, on the phone, via Teams or FaceTime, or at her attorney's office. The caseworker arranged cab transportation for Tiffany whenever she needed it, understanding that riding the bus was triggering for her. The caseworker

---

[32] *See Maisy W.*, 175 P.3d at 1268 (requiring holistic inquiry regarding active efforts). We note that Tiffany argues that because the superior court failed to consider OCS's efforts as a whole, the matter should be remanded for the court to conduct the required analysis. But given that the determination of whether OCS's overall efforts were active is a legal question, we are able decide it regardless of whether the superior court did. *See Bill S.*, 436 P.3d at 981 (reviewing de novo whether superior court's legal determinations satisfy active efforts requirements under child in need of aid (CINA) rules and ICWA).

also worked closely with the Tribe throughout the case. He tried to connect Tiffany to mental health services by attempting to contact her previous therapist, encouraging her to reach out to a mental health provider and offering to call that provider with her, and assisting her with filling out required ROIs. He developed two case plans. He referred Tiffany to drug testing and ensured she would be able to go to the testing center despite prior issues there. He also arranged visitation with Andi and tried to find alternate locations for visitation after Ginny raised concerns about Tiffany's threats. Taken together, OCS's efforts pre- and post-remand were active.

To the extent Tiffany suggests OCS's prior passive efforts prevented it from ever being able to establish active efforts, we reject this argument. Such an interpretation could lead to absurd results, contrary to the central purpose of the CINA statutes — to promote a child's best interest.[33] Indeed, such an approach could eliminate the ability to achieve permanency for some children.

Additionally, the superior court here properly considered Tiffany's level of engagement in its active efforts analysis.[34] Noting Tiffany's "active resistance" to working with OCS, the court identified ways in which the caseworker responded to that resistance following remand, including consistent flexibility and willingness to work with Tiffany in ways that she preferred. The court properly discussed Tiffany's engagement with OCS's efforts to give context to those efforts and to examine OCS's responsiveness to Tiffany. Similarly, the testimony of the expert clinical social worker noted the caseworker's trauma-informed approach toward working with Tiffany and concluded there was nothing OCS "could have done differently in this situation." The

---

[33] AS 47.10.005; AS 47.10.088(b); CINA Rule 1(c); *Miranda T. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 524 P.3d 1105, 1116 ("[T]he fundamental basis for CINA proceedings is the child's best interests.").

[34] *See Mona J.*, 511 P.3d at 562-63 (describing three ways parent's unwillingness to cooperate with OCS can impact court's active efforts analysis).

record and testimony at the termination trial reflected the challenges OCS faced in trying to build trust with Tiffany, and the court properly considered these challenges and concluded OCS provided active efforts.

We affirm the court's conclusion that OCS provided active efforts to reunify the family.

**B.    The Court Properly Considered The Cultural Expert Testimony And Report.**

Before terminating parental rights, ICWA requires that a court find "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[35] Bureau of Indian Affairs (BIA) regulations note that "a qualified expert witness . . . should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe."[36] "The BIA's choice of the word 'should' indicate[s] that, as a default rule, the need for cultural expert testimony is to be presumed."[37] The BIA's purpose for requiring cultural expert testimony was to ensure that decisions regarding parental rights "are not based on 'a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family.' "[38] "Consistent with this guidance from the BIA, we have held that the exception to the requirement of cultural expert testimony is 'very limited' " and that OCS bears the burden to show that cultural expert testimony falls within the limited exception where it need not elicit such expert testimony.[39]

---

[35]    25 U.S.C. § 1912(f); *see* CINA Rule 18(c)(4).

[36]    25 C.F.R. § 23.122(a) (2024).

[37]    *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1012 (Alaska 2022).

[38]    Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,829 (June 14, 2016) (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989)).

[39]    *Cissy A.*, 513 P.3d at 1010, 1014.

Tiffany argues here that the superior court erred when it did not make specific findings regarding the cultural expert's testimony other than observing that she testified at the trial. Tiffany claims this dearth of analysis means there is nothing for this court to review to determine whether the case complies with ICWA's cultural expert testimony requirement. Given the nature of the testimony at issue here, we disagree.

Here, OCS presented both a clinical social worker and a cultural expert as expert witnesses related to the harm that could result from returning Andi to Tiffany. Both experts' reports were admitted into evidence. The clinical social worker testified in detail regarding the risks of harm to Andi should she be returned to Tiffany's custody, and explained those risks in her report as well. The cultural expert agreed with the clinical social worker and testified that the social worker's opinion did not exhibit or suffer from any misunderstanding of, or failure to appreciate, any cultural standard or practice.

Particularly given the way the evidence unfolded, the court did not err by focusing its findings on the clinical social worker's testimony and failing to make specific findings about the cultural expert's testimony. Where the cultural expert's testimony and report indicated she was in agreement with the social worker's recommendations, and where the court acknowledged the testimony and reports provided by both experts, the court was not required to make additional findings. We therefore affirm the superior court's analysis of the relevant expert testimony.

V.    **CONCLUSION**

We AFFIRM the termination order.